### VON MUMM et al. v. FRASH et al.

#### (Circuit Court, E. D. New York. June 7, 1893.)

1. TRADE-MARK—INFRINGEMENT—WHAT CONSTITUTES—INJUNCTION.

One who puts into the hands of retail dealers an article made by him, and so dressed up as to enable such dealers to deceive the ultimate purchaser into the belief that he is purchasing the goods of a third person, may be enjoined by the latter.

2. SAME—EVIDENCE.

Where the proofs warrant the conclusion that the only reason why defendants dress up their article in the manner employed by them is because it can be successfully used to defraud the ultimate consumer, it is unnecessary to prove that any particular person has been in fact so defrauded.

3. SAME—COMPARISON OF DEVICES BY THE COURT.

In determining whether a trade-mark is infringed, the court may base its conclusions upon a comparison of the devices used by plaintiff and defendant, and does not necessarily require the testimony of witnesses as to the likeness. Coats v. Thread Co., 13 Sup. Ct. Rep. 966, 149 U. S. 562, followed.

4. SAME—REMEDIES—INJUNCTION.

In 1866, plaintiffs, at Reims, France, originated a champagne wine having a "dry" flavor, which has since been very extensively sold in the United States as "G. H. Mumm & Co.'s Extra Dry," and is distinctively known by the term "Extra Dry." In the beginning, plaintiffs adopted a new and characteristic metal capsule, of a peculiar rose color, never before used, on top of which is stamped, in blue, an imperial mantle, bearing a trade-mark, while, running perpendicularly, are the words "G. H. Mumm & Co." Just below the capsule is a small label, on which the trade-mark is also imprinted. The principal label of the bottle also bears this trade-mark in its upper field. Defendants sell an aerated American wine in ordinary champagne bottles. On the upper part of the principal label they put the words "Extra Dry," and also a colorable imitation of the imperial mantle, bearing a colorable imitation of the Mumm trade-mark. Just below the capsule they place a small label, bearing a similar imitation of the trade-mark and mantle, and the words "Extra Dry." The metal capsule is of the peculiar color used by Mumm & Co., and on its top are stamped, in blue, an imitation of the trade-mark and mantle, while the words "Extra Dry" are stamped perpendicularly thereon, in the same place in which plaintiffs stamp "G. H. Mumm & Co." Defendants' wine has no "dry" quality, and the court found from the testimony that the words "Extra Dry" were used by them for the purpose of fraud, and that their bottles were dressed up so as to enable them to be put off as the goods of plaintiffs. *Held*, that defendants should be enjoined (1) from further dressing up their product in the manner before employed, or from using in combination the marks, labels, and capsules described; (2) from using any colorable imitation of plaintiffs' trade-mark; (3) from placing the words "Extra Dry" on any bottles of their product, of the character described, either in combination or otherwise; (4) from surrounding the neck and cork of any bottles of the form generally used for champagne, and containing their product, with the rose-colored metal capsule, whether stamped as before, or otherwise.

In Equity. Bill by Peter Herman Von Mumm, doing business as G. H. Mumm & Co., and others, against Christian C. Frash and

Caroline E. Frash, composing the firm of Frash & Co., to enjoin the infringement of a trade-mark, etc.    Decree for complainants.

Rowland Cox, for complainants.
Goepel & Raegener, for defendants.

BENEDICT, District Judge.    This is a suit in equity, brought by G. H. Mumm & Co., manufacturers of champagne wine, to restrain the defendants from infringing their trade-mark, and from conducting an unfair competition, by manufacturing and selling their manufacture put up in a form calculated to induce its purchase as the champagne wine known as "G. H. Mumm & Co.'s Extra Dry." The following facts appear by the testimony: The complainants are aliens engaged in the production of champagne wine at Reims, in the republic of France, under the style of G. H. Mumm & Co.    Their business was established there in 1851, and their wines have since been extensively sold in the United States. During the year 1866 they originated a champagne wine having what is known as a "dry" flavor.    To this wine they then gave the name of "Extra Dry."    This name they have ever since applied, in a variety of ways, upon the bottles in which they have sold wine of the character originated by them in 1866, and upon no other bottles.    This wine, upon its introduction into the United States, became popular.    Since then, according to the testimony of complainants' agents, millions of bottles of it have been sold in the United States, and for a period of from 15 to 20 years it has been one of the most, if not the most, popular brand of champagne sold in the United States.    The words "Extra Dry," thus applied to the wine in question when it was first put upon the market, have been so extensively and so exclusively used to designate this particular wine that the words have come to be, to a large extent, a name whereby to distinguish the wine as wine manufactured by the complainants, and of the quality of the wine originated by them in 1866.    It also appears that, since the popularity of this wine was assured, other manufacturers have, to some extent, used the words "Extra Dry" in connection with wines of their manufacture; but according to the testimony the term has never come to be the well-known name of any wine, save only the champagne wine of G. H. Mumm & Co., so named by them in 1866.    This is shown by the testimony in the case that a written order, "Please give the bearer one pint of 'Extra Dry' cold," when presented at the Astor House, at the Cosmopolitan Hotel, at the Hoffman House, at the St. James Hotel, and at the cafes of Frederick Gerkens, of Nelson & Co., of Cable, Bailey & Co., in each instance, brought a bottle of G. H. Mumm & Co.'s Extra Dry Champagne.    The effect of this testimony is not overcome by the testimony introduced in behalf of the defendants to show that in other places a similar order provoked the inquiry, "What brand of 'Extra Dry?'"

In order further to distinguish their champagne wine of the character in question, G. H. Mumm & Co., at the time of introducing

the wine, placed upon all bottles containing wine of this character a new and characteristic metal capsule, of a peculiar rose color, differing in color from any other known capsule then in use, upon which capsule were stamped the words "G. H. Mumm & Co.;" and this rose-colored capsule, which the complainants were the first to adopt, and which they applied to their champagne, named by them "Extra Dry," has come to be an important, if not the principal, means by which, in practice, that wine is identified. The manager of the Astor House bar testifies that he is invariably governed by the rose-colored cap in identifying this wine. Mr. Chamberlain, of Washington, testifies that, when he sees the rose-colored cap upon a bottle of champagne wine, he takes it to be G. H. Mumm & Co.'s Extra Dry. The importance of the cap of a bottle of champagne wine as a means of identification appears by the fact proved, that in use the principal label upon a bottle of champagne wine is frequently washed off when the wine is cooled, and, if still remaining on the bottle when served, is often covered by the napkin usually wrapped about a bottle of wine when the wine is poured out.

Furthermore, in order to distinguish wines of their manufacture, G. H. Mumm & Co., shortly after their organization, some 40 years ago, adopted a trade-mark consisting of the representation of an eagle with head erect and wings extended, which they applied to all of their wines by means of labels and otherwise. This trade-mark they registered in the United States in 1876, and in the year 1881. They have also used extensively, in connection with the wine in question, advertising show cards, containing the representation of a French or imperial mantle, on which were imprinted the words, "G. H. Mumm & Co. Extra Dry;" and this to such an extent, according to the testimony, that the mantle, with the words "Extra Dry" imprinted upon it, has become associated with the wine in question in the public mind.

These several identifying marks have been placed upon all bottles of the G. H. Mumm & Co.'s Extra Dry Champagne in the following manner: In the upper field of the principal label of the bottle the trade-mark above described is imprinted. Just below the capsule a small label is placed, upon which the above described trade-mark is also imprinted. Above this label the neck and mouth of the bottle is inclosed in a metal capsule of the peculiar rose color adopted by G. H. Mumm & Co. in 1866, upon which capsule the words "G. H. Mumm & Co.," running perpendicularly, are stamped in the metal. On the top of the capsule is stamped, in blue color, the imperial mantle above described, upon which mantle the trade-mark is also stamped. By these means a very perfect identification of the wine is accomplished.

The defendants make and sell a fluid which, according to the testimony, is American wine aerated; that is to say, made to sparkle, when the bottle is opened, by introducing carbonic acid gas into the bottle, under pressure. This manufacture the defendants dress up as follows: They use an ordinary champagne bottle. In the upper part of the principal label upon the bottle they place the

words "Extra Dry," and also a colorable imitation of the trade-mark of G. H. Mumm & Co., imprinted upon a colorable imitation of the imperial mantle above described. Just below the capsule they place a label, on which is a similar imitation of the trade mark and mantle of G. H. Mumm & Co., and the words "Extra Dry." Above this label they inclose the neck and mouth of the bottle in a metal capsule of the rose color adopted in 1866 for G. H. Mumm & Co.'s Extra Dry. Upon the capsule the words "Extra Dry" are stamped, the words running perpendicularly, in the same place where, on the wine of G. H. Mumm & Co., the name of "G. H. Mumm & Co." is stamped. Upon the top of this metal capsule the defendants stamp, in blue color, an imitation of the trade-mark and the imperial mantle employed by the complainants to identify G. H. Mumm & Co.'s Extra Dry. It will be observed that in two places upon their bottle, where, upon a bottle of the complainants' wine, the words "G. H. Mumm & Co." are placed, the defendants put the words "Extra Dry," which words, as already stated, have, by long and extensive use, become associated in the public mind with G. H. Mumm & Co.'s Extra Dry, as the name thereof. From this description it is seen that the similarity in the dressing up of the bottles of the defendants' manufacture and the bottles of G. H. Mumm & Co.'s Extra Dry is striking.

The principal labels upon the bottles of the defendants' manufacture differ in some particulars from the principal labels on the complainants' bottles. On the principal label of a bottle of the genuine G. H. Mumm & Co.'s Extra Dry, under the trade-mark, the words "Extra Dry" are printed with the words, "G. H. Mumm & Co., Reims, France," while on the principal label of the defendants' product, under the words "Extra Dry," are the words, "Imperial Cabinet, Frash & Co." This difference in the principal labels is of little importance, however, by reason of the fact proved, that the principal label of a bottle of champagne wine is frequently gone when served, or, if present when served, frequently covered. For the same reason it is of little importance to the present controversy that the defendants put their own name upon the principal label of their bottles, and do not put there the name of G. H. Mumm & Co. What is of importance is that the defendants, on the principal label of their bottles, put the words "Extra Dry," coupled with an imitation of the trade-mark of G. H. Mumm & Co., imprinted upon an imitation of the imperial mantle above described, and the further fact that, while the complainants put the name of G. H. Mumm & Co. upon their bottles in three different places besides the principal label, the defendants put their name only upon the label, which, as already stated, is frequently, if not generally, absent from the bottle when the wine is served, and can easily be removed therefrom without its absence being observed. In connection with the use of the words "Extra Dry" by the defendants, it is important to observe that the testimony discloses that the words "Extra Dry" are not used by the defendants to describe any quality of their article, but for the purpose

of fraud. The testimony shows that the manufacture of the defendants is all of the same grade, without, so far as appears, any "dry" flavor. This article they sell under various names, sometimes with, sometimes without, the words "Extra Dry," and they keep on hand a great many labels, bearing different names, mostly fictitious, which they apply to the bottles of their article, as may be desired.

From the testimony presented the following conclusions may properly be drawn: (1) That the defendants dress up their manufacture in a way calculated to enable it to be put off as the champagne wine manufactured by the complainants, and sold by the name of "G. H. Mumm & Co.'s Extra Dry." (2) That the defendants dress up their product in this way to the end that it may be put off as wine manufactured by the complainants. (3) That they do not use the words "Extra Dry" for the purpose of describing any quality of their article, but to enable their article to be put off as the wine of the complainants. (4) That for the same reason they cover the neck and mouth of a champagne bottle containing their product with a metallic cap of the rose color so long used by the complainants to identify their wine. (5) That injury is done to the complainants, and further injury to them is threatened, by the action of the defendants in dressing up and selling their product. (6) That the interposition of a court of equity is necessary to protect the complainants from being injured by the act of the defendants, and to enable the complainants to reap the benefits which they are entitled to derive from their success in originating the champagne wine popularly known as "G. H. Mumm & Co.'s Extra Dry," and the popular favor with which this wine has been received by the public.

Many decisions of the courts can be found, having more or less bearing upon the questions of law thus presented. The following may be noticed here:

In Koehler v. Sanders, 122 N. Y. 74, 25 N. E. Rep. 235, it is said by the New York court of appeals:

"There are cases where the right to use a name to designate a product is so qualifiedly exclusive that the right to the protection of its use against infringement by others rests upon the ground that such use by them is an untrue or deceptive representation. The application of this principle is not necessarily dependent upon a proprietary right in a name, or the exclusive right to its use. But when another resorts to the use of it fraudulently; as an artifice or contrivance to represent his goods or his business as that of the person so previously using it, and to induce the public to so believe, the court may, as against him, afford relief to the party injured."

In Thompson v. Montgomery, 41 Ch. Div. 35, cited by the supreme court in the case of Coats v. Thread Co., hereafter referred to, (149 U. S. 562, 13 Sup. Ct. Rep. 966,) the controversy related to ale manufactured at Stone, in Staffordshire. There, in deciding to enjoin the defendants from using the words "Stone Ale," the judge says, (page 51:)

"I am satisfied that the defendant does not use the words 'Stone Ale' for any honest purpose whatever, but, according to the evidence, with a distinctly fraudulent purpose. Is there any reason, then, why the court should not deal

with him accordingly, and prevent him from carrying out such intention, by restraining him from using the words which he will only use for that purpose?"

In the case of Johnston v. Ewing, L. R. 7 App. Cas. 219, the house of lords say:

"No man has a right to adopt and use so much of his rival's established trade-mark as will enable any dishonest trader, into whose hands his own goods may come, to sell them as the goods of his rival."

In Manufacturing Co. v. Loog, 18 Ch. Div. 412, it is said:

"No man is permitted to use any mark, stars, or any other means whereby, without making a direct false representation himself to a person who purchases from him, he enables such purchaser to tell a lie, or make a false representation, to somebody else, who is the ultimate customer."

Says the lord chancellor in Wotherspoon v. Currie, L. R. 5 H. L. 517:

"It was long ago pointed out that it is not upon the mala mens towards the buyer that the decision of the case rests."

In Lever v. Goodwin, 36 Ch. Div. 1, the court says:

"Now, it has been said more than once, in this case, the manufacturer ought not to be held liable for the fraud of the ultimate seller; that is, the shop-keeper or the shopkeeper's assistant. But that is not the true view of the case. The question is whether the defendants have or have not knowingly put into the hands of the retail dealers the means of deceiving the ultimate purchasers."

The question thus stated I consider to be the question here, and the answer must be that the defendants knowingly put into the hands of the retail dealers an article of the defendants' manufacture, so dressed up that, in the hands of the retail dealers, it is an effective means of deceiving the ultimate purchaser into the belief that he is purchasing the champagne wine of the complainants known as "G. H. Mumm & Co.'s Extra Dry."

At the argument great stress was laid by the defendants upon a decision in their favor, rendered by Judge Coxe, in an action similar to this, brought by the same complainants, in the southern district of New York, (Mumm v. Kirk, 40 Fed. Rep. 589,) which decision, it is insisted, should control the decision of the present case. But in controversies of this character, as has been stated by the New York court of appeals in the case of Fischer v. Blank, cited below, (33 N. E. Rep. 1040,) "each case must, in a measure, be a law unto itself." The case decided by Judge Coxe related to a different defendant, and to a wine differently marked. In that case the difference between the two methods of dressing up the goods, presented to the court, was so great that it was found as a fact that the defendants' article could not be used for fraud unless the vendor happened to be a knave, and the purchaser an imbecile. Far different is the case at bar. In this case it has been made plain that the defendants dress up their manufacture in a manner well calculated to deceive an intending purchaser not initiated, and induce him to believe that the article purchased is the wine of the complainants, known as "G. H. Mumm & Co.'s Extra Dry." This dress the defendants adopt for the purpose of enabling such a fraud to be practiced. No other reason has been suggested, and

none exists. The fact that an article such as the defendants make is dressed up by them as they dress it proves the existence of knaves willing to use the defendants' article for the purpose of deceit, and also the existence of persons not initiated capable of being deceived into buying the defendants' manufacture as G. H. Mumm & Co.'s Extra Dry. If there were no such persons the defendants never would have gone to the expense of dressing up their product as they do.

But it is said that the defendants are guiltless because they have never stated anything but the truth in regard to their manufacture. The earnestness with which this ground of defense has been pressed upon the court justifies some further comment upon the character of the act of the defendants in dressing up their article as they do. What the defendants do is this: They make, and put in the hands of other persons, the means of fraud, knowing that these means can be, and probably will be, employed for the purpose of fraud, and to the injury of the complainants. The defendants make and sell, knowingly, the tools for fraud; and they, and the knaves who buy the tools of them, intending to use them for the fraudulent purpose for which they were constructed, are co-conspirators, each guilty of the fraud perpetrated in pursuance of the intention with which the tools were made, and this although the particular person intended to be defrauded is not agreed upon between them. A person who knowingly sells counterfeit money, of his manufacture, to a person who buys it as counterfeit money, with intent to utter it as true, is found guilty of selling counterfeit money with intent to defraud. The use of "a token by which the party acquires a greater credit;" "some token which may affect the public;" "fraud which, in its nature, is calculated to deceive numbers;" "selling goods with counterfeit marks;" "placing a false mark upon a spurious article, to pass it off as genuine," (Dr. Burns, J. P. vol. 3, p. 271,)—are the ingredients of crime at common law. Present as these ingredients are in this case, they show the defendants guilty of fraud when they make and sell a product dressed up in the manner described. "There is no difference, in point of evidence, whether the case be a criminal or civil case. The same rules apply to both." 2 Russ. Crimes, p. 354. The defendants, when they make and sell an article dressed up, as it is, in a form calculated to deceive numbers into the belief that it is the champagne wine manufactured and sold by the complainants under the name of "G. H. Mumm & Co. Extra Dry," could be convicted of misdemeanor at common law. "Deceitful practices, involving considerations of public trade, which defraud another of his known right, by means of some artifice or device, contrary to the plain rules of common honesty, are cheats punishable at common law." Id. p. 280. "The chief ingredients of the crime of forgery, which is a misdemeanor at common law, are fraud, and an intent to deceive by imposing upon the world that as the act of another, to which he has never consented." Id. p. 367. Acts of this character are always unlawful, and, when they cause special injury, give the

person injured a right of action, and the right, in a proper case, to the protection of a court of equity.

Since the argument of this case, two recent decisions,—one by the New York court of appeals, (Fischer v. Blank, 33 N. E. Rep. 1040,) and the other (Coats v. Thread Co., 149 U. S. 562, 13 Sup. Ct. Rep. 966) by the supreme court of the United States,—have been brought to my attention by each of the parties to the controversy, as supporting its contention in this case. I find in the decision of the New York court of appeals distinct support for a decision in favor of these complainants. In that case it was declared that, although there could be no exclusive right to a name which indicates a characteristic quality of the article to which it is applied, such a name, when used in connection with a particular form, style, color, and embellishment of the package that had been adopted by the plaintiff, and when the resemblance between the defendants' package and that of the plaintiff is such that there is danger that the one may be taken for the other, to the detriment of the plaintiff, and to the deception of the public, it is the province of equity to interfere for the protection of the purchasing public, as well as the complainant, "and for the suppression of unfair and dishonest competition." Such is the case at bar. The defendants apply to a bottle of the form generally used for champagne wine, and containing their product, the name "Extra Dry," in connection with the rose-colored cap adopted by the complainants, in 1866, to designate their wine, and also in connection with the eagle, with head erect and wings extended, adopted by the complainants as their trade-mark, also in connection with the imperial mantle used by the complainants in their advertising, and which has been above described; and, by applying these designating marks in the way they do, the defendants make their manufacture so to resemble the manufacture of the complainants that one may be taken for the other, to the detriment of the complainants, and the deception of the public.

It is further to be observed that although, in the case decided by the New York court of appeals, there was no testimony from witnesses that in the trade the defendants' manufacture had been taken for the other, the danger of such mistake was held sufficient to call for the interference of the court. See, also, Braham v. Beachim, 7 Ch. Div. 856. That case, therefore, overthrows the objection taken here, that there is no evidence of any instance where a person has been defrauded by the method adopted by the defendants in dressing up their manufacture. In a case like the present it would be too much to require the complainants to prove instances of such deception. It is not likely that the knave who perpetrates the fraud upon the ultimate consumer will disclose himself to the complainants; and the ultimate consumer, if cognizant of the fraud practiced upon him, could not, unless by mere accident, be known to the defendants. Such testimony is unnecessary, where, as here, the proofs warrant the conclusion that the only reason for the dress adopted by the defendants

for their product is that it can be successfully used to defraud the ultimate consumer. Moreover, it is not to be disputed that danger of injury to the complainants is created by the defendants' method of dressing up their article, and danger of injury is sufficient ground for the interposition of a court of equity.

The other decision referred to is a recent decision of the supreme court of the United States in the case of Coats v. Thread Co. I find in this decision no support to the defendants' contention in this case. In the first place, I observe that in that case the question whether the resemblance between the designs upon the complainants' and the defendants' spools of thread was such as to indicate an unlawful intent was determined by comparison of the two designs. This disposes of defendants' contention here that the court cannot, in this case, find such a resemblance, because no witnesses have been called to testify to that effect. In the next place, the supreme court say:

"Irrespective of the technical question of trade-mark, the defendants have no right to dress their goods in such a way as to deceive an intending purchaser, and induce him to believe he is buying those of the plaintiff."

As this is just what these defendants do, the unlawfulness of their act is no longer open to question.

The supreme court, in the case referred to, dismissed the bill upon the ground that intent on the part of the defendants to impose upon the public has been disproved by the defendants, and the dress of the goods adopted by the defendants bore so little resemblance to the dress adopted by the plaintiff that mistake could hardly be possible. In the case at bar an intention on the part of the defendants to impose upon the public by means of the dress in which they put up their manufacture is found proved. A comparison of the two articles shows that imposition and injury to the complainants is a natural result of putting upon the market defendants' article, dressed up as they dress it. There is also testimony that such would be the result, from a witness—Mr. Chamberlain—whose competency to speak on such a matter cannot be denied.

I have not overlooked the remark of the supreme court that the defendants were not bound to such a degree of care in avoiding resemblance between the dress of their thread and the dress of complainants' thread as might induce a careless person to accept one for the other. But this is said in reference to a case where intention to defraud was found to have been disproved, and where the court was asked to decide that a manufacturer who has done nothing to enable his product to be put off as being the manufacture of another is responsible for the imposition upon the ultimate purchaser, accomplished solely by a false statement in regard to his manufacture, made by the shopkeeper. I find nothing in this to prevent the complainants from receiving protection in the present case, where the means of accomplishing the imposition are furnished by the manufacturers, and are sold with knowledge that they are bought because they are capable of

deceiving the ultimate purchaser. In such a case it is no answer to say that the ultimate purchaser was ignorant or unwary. As I understand it, the law is intended for the protection of the ignorant, the weak, and the unwary. The sharp and the shrewd take care of themselves without aid from the courts. The defendants dress up their article in the way they do with the distinct purpose of enabling the weak, the ignorant, and the careless to be defrauded thereby; and, when their purpose is accomplished, I discern no just ground upon which to except them from responsibility. At common law it is not necessary that the false token used should be such that ordinary care and common prudence were not sufficient to guard against the deception. People v. Haynes, 14 Wend. 557. It is said by Lord Mansfield that frauds by means of false tokens cannot be guarded against by common care and prudence. Rex v. Wheatly, 2 Burrows, 1129. The injury to the complainants and to the public is the same, when, by the means provided by the defendants, a bottle of the defendants' manufacture is put off as the wine of the complainants, whether the purchaser be wise or ignorant, careful or careless.

Upon these grounds, my decision is that the complainants have shown the defendants guilty of unfair competition in dressing up their article of their manufacture in the manner described, and are entitled to an accounting, accompanied by an injunction. As to the extent of the prohibition to be awarded, I am of the opinion that the defendants should be prohibited (1) from dressing up their product in the manner heretofore employed by them, or from using in combination the marks, labels, and capsules described. (2) They must also be forbidden to use upon any bottles of their product colorable imitations of the complainants' trade-mark, which they have hitherto placed upon their bottles, or any similar imitation thereof. (3) They should also be prohibited from placing the words "Extra Dry" upon any bottles of their product, of the character that has been described, either in combination or otherwise. This upon the ground that the words "Extra Dry," as applied by them to the article they manufacture, constitute an untrue and deceptive representation, made, not for the purpose of description, but for the purpose of fraud, and which are calculated to deceive, to the injury of the complainants. (4) They must also, upon the same grounds, be prohibited from surrounding the neck and cork of a bottle of the form generally used to contain champagne wine, which contains their product as herein described, a rose-colored capsule of metal, whether stamped with the words "Extra Dry," and an imitation of the complainants' trade-mark, as in the exhibit before the court, or otherwise. The rose color in question may doubtless be lawfully used in other ways than in the way indicated. But the use which the defendants make of the rose color, in connection with a metal capsule upon bottles of the form usually employed to contain champagne wine, which contain their product, is accompanied with a fraudulent intent, and when so used constitutes an untrue and deceptive representation, which may

well be forbidden by a court of equity. No injury to the defendants can follow such a prohibition as I have decided. The public will be protected thereby from fraud, and the complainants relieved from danger of injury. If any doubt can be fairly entertained as to defendants' purpose in using a rose-colored capsule in the way they do, as was said by Judge Wallace in Association v. Piza, 24 Fed. Rep. 151, "it is not unreasonable to resolve any doubt that may remain in favor of the complainants."

Let a decree be entered in conformity with this opinion.