[S. F. No. 15013. In Bank.—May 28, 1935.]

AMERICAN PHILATELIC SOCIETY (a Corporation) et al., Appellants, v. A. L. CLAIBOURNE et al., Respondents.

Bianchi & Hyman for Appellants.

Faulkner & O'Connor for Respondents.

CURTIS, J.—An appeal from a judgment in favor of defendant A. L. Claibourne entered on a minute order denying a motion for injunctive relief, and sustaining a demurrer to the complaint without leave to amend. The American Philatelic Society, a corporation composed of some 4,000

owners and collectors of postage stamps, many of whom are dealers therein for profit; R. H. Mower, who deals in the buying and selling of various types of postage stamps for profit, and J. M. Stahn, a private collector and owner of stamps, are joined as parties plaintiff. The gist of the complaint is that respondent has so marked and perforated certain issues of United States postage stamps that they simulate, to the point where only experts can distinguish them, certain other issues, the supply of which is more limited and the market price of which, because of their rarity, is much greater, and has circularized practically all of the stamp dealers in the United States, thus placing upon the market for sale these stamps so marked and perforated by himself, which may be palmed off by unscrupulous dealers upon the unsuspecting public and in unfair competition with honest dealers. An injunction is sought upon the ground, not that respondent himself is attempting to palm off the counterfeited stamps as genuine, but that equity will restrain the placing of tools of fraud into the hands of dealers or vendors.

We are satisfied that appellants are entitled to the aid of the court of equity to prevent the consummation of threatened fraud and the complaint sets out sufficient grounds for injunctive relief. It is, of course, a matter of common knowledge that philately, or stamp-collecting, is extensive not only in this country but throughout the world and that many hundreds of thousands of dollars are invested in stamps, the value of which lies not in their beauty or design but in their rarity. Any reference hereinafter made to stamps is with reference to their value as a commodity dealt in by collectors and dealers and is entirely distinct and apart from any reference to their value as a medium of exchange or compensation for postal service.

The complaint briefly sets out the fact that the United States government sold certain stamps in a perforate condition and some similar stamps in an imperforate condition; that the stamps issued by the government in a perforate condition have, by reason of certain imperfections in perforation or other distinguishing marks, acquired by their rarity a high value and are only available for purchase or collection through individual dealers and owners; that the stamps sold by the government in an imperforate condition are much less valuable than those issued in a perforate

condition; that respondent became the owner of a large quantity of imperforate United States government stamps of the kind, type and denomination which, if they had been of the number of those issued by the government in a perforate condition, would have been exceedingly valuable; that respondent perforated in various combinations, or caused to be so perforated, all of his stock of stamps of this class; that such perforation "rendered each and all of said items similar and identical in form and appearance" with the stamps actually issued by the government in a perforate condition; that the action of the respondent in perforating said items of stamps in different combinations resulted in counterfeiting the same to simulate stamps theretofore issued and sold by the United States government in a perforate condition and in the creation of a supply of spurious stamps simulating the genuine variety; that respondent has prepared a circular labeled "Price List", in which are listed fifty-five items, which are given the same number as those given to similar items in the catalogue of Scott's Stamp and Coin Company, Ltd., of New York, which catalogue was of general use in the stamp trade and that opposite each item in one column is given the price quoted in Scott's catalogue for the particular genuine perforate stamps listed, and in a parallel column the price, which was very much lower, at which respondent would sell said spurious items; that respondent has mailed said price list, accompanied by a circular letter, to all dealers and others in the United States interested in philately with the object of flooding the market with spurious items of stamps and intending that unscrupulous postage stamps dealers shall offer these stamps for sale and sell them to the public generally as genuine perforate stamps issued by the United States government; and that "the flooding of the market by the said spurious articles results, and will continue to result, in depreciating the value of the collections of stamps owned by the plaintiffs herein and other collectors throughout the United States and in fraud upon prospective buyers, sellers or collectors of stamps". Accompanying the complaint are three exhibits. Exhibit A consists of a copy of the price list. Exhibit B consists of a copy of the circular letter which was mailed with the price list. Exhibit C consists of a price list compiled by appellants which duplicates the price list

of respondent but contains two additional parallel columns in which are listed the catalogue number (Scott's catalogue) of the stamps issued by the government in an imperforate condition of the same variety as the postage stamps issued by the government in a perforate condition, together with the price quoted by Scott's catalogue for such imperforate stamps. A glance at the first five items will serve to demonstrate the existence of a wide differential in the price of the genuine perforate stamps and the imperforate stamps. For example, a genuine perforate stamp worth $400 is worth only $1.20 imperforate, and is offered for $20 by respondent after perforating it to resemble the genuine perforate stamp.

| Item | Scott's Catalogue Number | Scott's Cat. Price | Price Offered by Respondent | Scott's Catalogue Number | Scott's Cat. Price. |
|------|------|------|------|------|------|
| 1 | 316 | $400 | $20 | 314 | $1.20 |
| 2 | 316 | —— | $20 | 314 | $1.20 |
| 3 | 316 | —— | $30 | 314 | $3.00 |
| 4 | 318 | $100 | $5 | 314 | $1.20 |
| 5 | 318 | —— | $5 | 314 | $1.20 |

[The stamps designated opposite the blanks in the third column have no reasonable market price as they are rare and are not readily obtainable except at auctions or private or collectors' stock.]

As before explained, exhibit A, being the price list circularized by respondent consists of the first four columns of this latter list, including, of course, all fifty-five items.

It is not appellants' contention that respondent intends or is attempting to deceive and directly defraud the dealers or stamp collectors who receive his price list. Although the respondent has listed therein the items under the numbers allocated in Scott's catalogue to genuine perforate stamps and did not use the number allocated in said catalogue to imperforate stamps, there is printed in fairly large type on the cover of the price list, the following words: "Mint Condition, Unofficial Separation", and on the back thereof in small type is the following statement: "All items listed are well centered and in prime mint condition. They have unofficial separation and are accurately gauged for perforation." There also appears at the top of the price list just above the items listed, "Mint Condition. Unofficial Separation." In view of the fact that the price list contains such

statements, such contention would not, of course, be tenable. Appellants do contend that respondent is furnishing unscrupulous dealers with an instrument of fraud and calling their attention to it by means of the circular letter which accompanies the price list which letter subtly suggests by the use of language therein employed that large profits can be made by buying these spurious stamps and selling them to prospective purchasers as genuine government perforated stamps. This circular letter reads as follows:

"Many varieties of United States postage stamps, in recent years, have mounted upward to where none but the most affluent collector may possess them. This has led finally to a situation where many middle-class collectors have been forced to discontinue, through financial inability to acquire such items. As the latter class is the backbone of the stamp dealer's business and, therefore, of the most vital importance to him, please give your fullest consideration to the following:

"I have in stock, and ready for immediate delivery, such rare and elusive items as Nos. 316, 318, 319D, 321, 322, 352, 387, 388, 405A, 424A, 424B, 424C, 461, 464, 498A, 498B, 498C, 499A, 499B, 499C, 501D, 501E, 519, 554A, 554B and 611A. These items are all with unofficial separation and it is my intention that they be sold as such by dealers.

"The merest glance at the price list enclosed, which is exclusively for dealers, will demonstrate most clearly the extremely low prices at which these rare items may be sold and a handsome profit realized. You can be the first in your territory to reap the benefit. Act now—fill out and sign the enclosed order card and a lot will be forwarded you by return mail, registration prepaid."

We think this letter is susceptible to the construction placed upon it by appellants. It is conceivable that in some commodities imitations or copies of the original might have a fairly high value simply as authentic copies, but since the entire value of a particular variety of stamp lies in its rarity, it is hardly credible that even a middle-class collector would desire a recognizable counterfeit enough to pay the difference between $1.20 and $20. It is plainly evident that the difference in value between an imperforate stamp worth $1.20 and an "unofficial separated" stamp priced at $20 is not any intrinsic worth which has been

added to the stamp by such unofficial perforation but the counterfeit value in that it may be palmed off as genuine.

It is also plainly evident that if respondent secures a higher price for imperforate stamps after they have been perforated by him so as to resemble the genuine government perforated stamps and this increased value is due to the possibility of such stamps being palmed off as genuine upon an unsuspecting purchaser, respondent has thereby obtained an advantage grounded in fraud and deceit and secured a benefit to himself to which he is not in honesty and fair dealing entitled.

There can be no question that appellants as owners, collectors and dealers in genuine stamps will suffer pecuniary loss if such practice is countenanced. It is self-evident that inasmuch as the market value is dependent upon the rarity of the genuine items such practice will tend to diminish the market value of the genuine article. There being only so many of these genuine government perforated stamps in existence, it will follow inevitably that if an additional supply be put upon the market and offered at a lower price, the value of the genuine stamps will seek the level of the spurious stamps to the pecuniary detriment of the owners, dealers and collectors who possess genuine stamps. It is also clear that if there is offered for sale spurious stamps identical with, or even so closely resembling the genuine perforated stamps that the difference can only be detected by an expert, the market for these particular varieties of stamps may be materially decreased and perhaps wholly wiped out. Any practice tending to cast doubt upon the authenticity of the genuine article will tend to destroy the market for such genuine article. If prospective purchasers become aware of the fact that counterfeit articles are being sold as genuine, many may decide not to take the chance of being victimized and may therefore abstain from buying any stamps of the particular variety in which substitutes are being offered.

To sum up the situation, it is apparent that, if the allegations of the complaint be true, the conduct of respondent in offering for sale these privately perforated stamps will inevitably result in severe pecuniary injury to the appellants, and the gaining by respondent of an advantage arising out of, in the final analysis, duplicity and dishonesty. The fact that respondent is satisfied to take a small profit,

leaving to another the actual fraud, the double-dealing and palming off, is wholly immaterial. He who induces another to commit fraud and furnishes the means is equally guilty. (*Warner & Co.* v. *Lilly & Co.*, 265 U. S. 526 [44 Sup. Ct. 615, 68 L. Ed. 1161].)      The case books are replete with cases which hold that the essence of unfair competition lies in the simulation and imitation of the goods of a rival or competitor with the purpose of deceiving the unwary public into buying the imitation under the impression that it is purchasing the goods of such competitor. (*Von Mumm* v. *Frash,* 56 Fed. 830, 834; *Hostetter Co.* v. *Brueggeman-Reinert Distilling Co.,* 46 Fed. 188, 189; *Hostetter Co.* v. *Becker,* 73 Fed. 297; *Frischer & Co.* v. *Bakelite Corp.,* 39 Fed. (2d) 247, 260; see 84 A. L. R., annotation, pp. 473, 474, 475, 476.)      So, likewise, it is immaterial to the charge of unfair competition that the respondent made no attempt to deceive the retail dealers and in fact frankly stated to them the true facts, that the stamps were unofficially separated. There is an abundance of cases recognizing and setting forth the well-settled rule that it is of no consequence in a charge of unfair competition that no deception is practiced on the retail dealers and they know exactly what they are getting; that the wrong lies in designedly enabling the dealer to palm off the copy or simulated article as that of the complainant. (*Von Mumm* v. *Frash, supra; Warner & Co.* v. *Lilly & Co., supra;* see 84 A. L. R., annotation, pp. 486, 487.) It is obvious that the warning as to the spurious nature of the stamps is entirely separate and distinct from the stamps and may readily be discarded. The stamps themselves, simulated to represent the genuine, tell the falsehood. We think the complaint herein sets out a case which falls squarely within the above-stated rules.

      Respondent makes no effective denial of the above propositions but relies in the main upon the fact that most of the cases dealing with questions of unfair competition are cases wherein the complainant has been a manufacturer or producer of the article imitated or simulated and has sought an injunction in protection of his property right in such commodity. It is of course but natural that the majority of cases involving unfair competition should deal with the rights of manufacturers and producers for the reason that

ordinarily it would be the manufacturer or producer who would suffer the pecuniary loss if imitative articles were sold by merchants in lieu of the producer's goods. But we see no good reason why that same protection against patently unfair practices should not be afforded to a vendor or dealer when, by reason of peculiar circumstances, such vendor or dealer is the one who will bear the loss caused by such dishonest practice. It is true that the vendors and dealers do not have the same property right that a producer or manufacturer has in a commodity, but it is also true that because of the uniqueness of the present situation, the production of the stamps by the United States government who is not interested in the philatelic aspect of the stamps and is not, therefore, interested in protecting their philatelic value, the dealers and stamp collectors do in fact have a property right somewhat similar to that of a producer which is menaced by respondent's conduct. It is also to be borne in mind that the rules of unfair competition are based not alone upon the protection of a property right existing in the complainants, but also upon the right of the public to protection from fraud and deceit. (*Ely-Norris Safe Co.* v. *Mosler Safe Co.*, 7 Fed. (2d) 603.) It may be granted that this case is a novel one and that it may be doubtful whether other cases in which the vendor and dealer rather than the manufacturer or producer is the one injured by unfair practices may soon arise, but the fact that a scheme is original in its conception is not a good argument against its circumvention. It has been said in the case of *Weinstock, Lubin & Co.* v. *Marks,* 109 Cal. 529, 539 [42 Pac. 142, 50 Am. St. Rep. 57, 30 L. R. A. 182], one of the leading cases on unfair competition in this state: "The fact that the question comes to us in an entirely new guise and that the schemer has concocted a kind of deception heretofore unheard of in legal jurisprudence, is no reason why equity is either unable or unwilling to deal with him. It has been said by some judge or law-writer that, 'no fixed rules can be established upon which to deal with fraud, for, were courts of equity to once declare rules prescribing the limitation of their power in dealing with it, the jurisdiction would be perpetually cramped and eluded by new schemes which the fertility of man's invention would contrive'." When a scheme is evolved which on its face violates the

fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one. There is a maxim as old as law that there can be no right without a remedy, and in searching for a precise precedent, an equity court must not lose sight, not only of its power, but of its duty to arrive at a just solution of the problem.

The argument proffered by respondent that appellants cannot have an injunction for the reason that the suit is brought on behalf of all philatelic dealers in the United States and it is evident that the threatened fraud can only be consummated with the cooperation of an unscrupulous dealer, one of the appellants, merits no discussion. Also utterly lacking in merit is the suggestion that appellants should be refused an injunction because they have in their possession imperforate stamps and may perchance perforate them to resemble government perforated stamps. If such a situation should arise, it is obvious that it can be dealt with adequately at that time. In the meantime the mere possibility furnishes no good ground for refusing to deal with a present existing unfair practice.

Under section 382 of the Code of Civil Procedure, the several plaintiffs were properly joined. Said section provides that when the question is one of a common or general interest to many persons, or when the parties are numerous and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all.

This opinion, dealing as it does with the correctness of the ruling sustaining the demurrer without leave to amend, is predicated upon the assumption that the allegations of the complaint are true, that is, that the unofficial separated stamps so closely resemble the genuine government perforated stamps that their falsity cannot be detected by an ordinarily careful philatelist, and that the business of selling stamps does not differ from the sale of ordinary commodities to the extent that the economic rules of commercial dealings, such as supply and demand, etc., do not apply. If appellants fail to sustain their allegations by proof, the injunction, of course, should be denied. If, on the other hand, they are able to support their allegations by proof, an injunction should issue restraining respondent

from disposing of such unofficial perforated stamps unless and until the stamps themselves be distinguished from the genuine government perforated stamps by placing such a distinguishing mark upon them as will effectively differentiate them from such genuine government perforated stamps. Respondent can have no ground of complaint against such injunctive relief. Such relief will only eliminate the unconscionable profit due to misleading the philatelic public by foisting upon it spurious stamps as genuine, and if there be any legitimate profit arising from the mere unofficial perforation of the imperforate stamps aside from the counterfeit element, it will preserve such profit to the respondent.

The judgment is reversed and the case is remanded to the trial court with instructions to overrule the demurrer, with the right to the respondent to answer said complaint if so advised.

Thompson, J., Waste, C. J., and Shenk, J., concurred.