**COAST TRADING COMPANY, a corporation, Plaintiff-Appellant,**

v.

**CUDAHY COMPANY, a corporation, Defendant-Cross-Appellant.**

**Nos. 77–1047, 77–1118.**

United States Court of Appeals, Ninth Circuit.

March 9, 1979.

As Amended April 12, 1979.

1075

David J. Buono (argued), of Lindstedt & Buono, Portland, Or., for plaintiff-appellant.

Jack B. Schwartz (argued), of Newcomb, Sabin, Meyer & Schwartz, Portland, Or., for defendant-cross-appellant.

Before DUNIWAY and CHOY, Circuit Judges, and GRANT, District Judge.

Before DUNIWAY and CHOY, Circuit Judges, and GRANT,* District Judge.

GRANT, District Judge:

This appeal involves an action by the plaintiff grain merchant against the defendant buyer for the anticipatory repudiation of a number of contracts for the purchase of barley.

Plaintiff, a Washington corporation, is a grain merchant with headquarters in Portland, Oregon. Its customers include other grain merchandisers, grain exporters, feed mills and processors and cattle feedlots. Defendant, a Delaware corporation, has its principal office in Phoenix, Arizona, and operated a feedlot for cattle in Sunnyside, Washington. From September 1973 through May 1974, the general manager of the feedlot was a Mr. Robin Van Woerden, having responsibility for day to day operations, including the purchase of supplies and feed. His compensation consisted of a salary and a bonus related to profits. Plaintiff had supplied feed grains to the feedlot since about 1954, and plaintiff was aware that the feedlot was owned by the defendant.

The trial court found that from 28 February to 2 April 1974, one of plaintiff's merchandisers and Van Woerden had executed 14 contracts for the sale of barley, totaling more than 10,000 tons. Van Woerden had been buying grain from other grain merchants in the same manner as from the plaintiff. The limited storage capacity at the feedlot (750–1,000 tons) required Van Woerden to arrange for outside storage. Because of that fact, plaintiff arranged for 1,500 tons of barley purchased by Van Woerden to be stored in Spokane, Washington.

In late May 1974, employees from defendant's home office first learned of the extent of barley purchases by the feedlot, and representatives of defendant met with plaintiff but no agreement could be reached. On 6 June 1974, defendant repudiated those contracts for which delivery had not been made on the basis that Van Woerden had no authority to bind defendant. Between 11 June and 19 June 1974, plaintiff allegedly sold over 10,000 tons of barley to eight purchasers and used those sales to compute resale prices for the barley repudiated by defendant. At the trial level, plaintiff argued that Van Woerden had both implied and apparent authority to bind his principal on all the contracts and plaintiff therefore sought the difference between resale prices and the prices in the repudiated contracts as damages under Section 2–706 of the Oregon Uniform Commercial Code.

The district court found that the general manager had implied authority to purchase reasonable amounts of barley for future delivery in order to assure a constant supply, but that this would not include authority for speculation in the barley market. The court concluded that in executing the 14 repudiated contracts, Van Woerden was speculating in the barley market and had exceeded his implied authority; likewise, that he had exceeded his implied authority in arranging for storage with plaintiff.

Addressing the apparent authority issue, the court found that Van Woerden had apparent authority to execute the contracts dated 28 February 1974 but that plaintiff could not rely on the apparent authority theory for contracts executed after 28 February 1974, because of changed market conditions. These conditions imposed a duty of inquiry on plaintiff regarding Van Woerden's authority in view of the continued orders of unprecedented size. Because plaintiff failed to make those appropriate inquiries, the court held that damages should be allowed for the repudiated con-

* Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

tracts signed on 28 February 1974, but not for the repudiated purchase or storage contracts signed after that date.

The court then grappled with the measure of damages under Section 2–706 of the UCC which allows the difference between the contract price and the resale price but requires *inter alia* that the seller must give the repudiating buyer reasonable notice of the private resale. The court found that no reasonable notice had been given defendant by plaintiff regarding some of the resales, amounting to 1,500 tons, but that reasonable notice was given for later resales amounting to 3,000 tons. Therefore, plaintiff was partially entitled to damages provable under Section 2–706. The court calculated damages for the 3,000 tons by subtracting the June resale prices ($363,475) from the 28 February contract prices ($384,-000) arriving at a difference of $20,525 in damages, to which the court added $3,606.84 in incidental damages. Interest was set at 1½% per month.

Thereafter, plaintiff instituted the present appeal, and defendant cross-appealed.

The parties present two main issues in this appeal: (1) the extent of the authority of Robin Van Woerden, and (2) the proper measure of damages.

## THE AGENT'S AUTHORITY

Plaintiff argues that the district court erred in holding that Van Woerden had neither actual nor implied authority to enter into any of the barley purchase or storage contracts and, likewise, that it erred in holding that he had no apparent authority to enter into the barley purchase or storage contracts executed subsequent to 28 February 1974. Plaintiff offers Van Woerden's managerial status and a $250,000 upper limit on inventory as factors showing actual authority.

To support its contention that Van Woerden had implied authority to purchase vast amounts of barley, plaintiff points out: (1) that during his stint as general manager, the number of cattle at the feedlot rose from 2,200 head to 17,000 head; (2) that the

volume of barley to be delivered under the plaintiff's contracts were within the feedlot's maximum monthly requirements (disregarding deliveries from other sellers); and (3) that Van Woerden was reasonable in buying vast quantities of declining-priced barley in order to have cheap feed for future use.

In arguing Van Woerden's apparent authority to enter into the contracts signed subsequent to 28 February 1974, plaintiff points out that it had dealt with defendant's feedlot managers for years without any repudiation from defendant's home office. Plaintiff avers that it had no duty to inquire into Van Woerden's authority because there was no notice of lack of authority, that barley is a normal product used in cattle feed, that future delivery was not unusual, and that the amounts scheduled for delivery were within the feedlot's capacity. Furthermore, plaintiff argues that it was not chargeable with notice of lack of authority because it neither knew of any loss of cattle from the feedlot nor of any amounts of barley purchased from other sources. Plaintiff claims that a dramatic rise in the price of barley over a three-year period (from $50 to $120 per ton) necessitated record costs.

The last argument plaintiff makes concerning the agency issue is Van Woerden's inherent power to bind defendant—a theory not based on implied or apparent authority but, rather, upon Section 161 of the Restatement (Second) Agency. A theory that if one appoints an agent to conduct a series of transactions over a period of time, it is fair that he should bear losses which are incurred when such an agent, although without authority to do so, does something which is usually done in connection with the transactions he is employed to conduct.

Defendant argues that Van Woerden had neither actual nor apparent authority to bind defendant to the barley transactions. Defendant supports the trial court's finding that Van Woerden was without actual or implied authority by pointing out that: (1) he verbally misstated his barley purchases

by 23,000 tons and fabricated a record to hide the untruth; (2) during the 34-day period from 28 February 1974 to 2 April 1974, he ordered five times the $250,000 upper limit expressly set on all inventory of all kinds of material on hand. Defendant contends this was speculation and extraordinary contracting not within an agent's implied authority.

Defendant argues that plaintiff cannot claim the benefit of apparent authority as to transactions after or on 28 February 1974, because plaintiff had knowledge sufficient to establish a duty of inquiry into Van Woerden's authority. To support the argument that plaintiff was chargeable with notice, the following factors are given: (1) plaintiff had serviced the feedlot account for 20 years and neither of the plaintiff's witnesses could recall any previous transactions remotely comparable in dollar volume or trading volume to the 28 February transactions; (2) plaintiff's salesman knew that the 28 February order committed the feedlot to two-thirds of the maximum monthly usage in the months of delivery, an unprecedented commitment; (3) plaintiff's salesman knew Van Woerden was buying additional quantities of barley from other grain merchants and also knew of the limited storage capacity at the feedlot and that Van Woerden was not the owner; (4) in the 33 days following the 28 February sales, plaintiff sold Van Woerden an additional 8,060 tons, bringing his total dollar commitment for the 34-day period to $1,486,000, exceeding the total dollar commitment for all of 1971, 1972 and 1973. The feedlot purchases in 1972 and 1973 averaged less than six per cent of plaintiff's barley ton-

nage. Defendant avers that in 1974 the feedlot purchases suddenly supplied 57% of plaintiff's volume and that this mere cattle feeding operation was suddenly out-buying the great international grain firms. Defendant argues that such notice defeats plaintiff's reliance on any theory of inherent agency power. The defendant prays that the trial court be affirmed regarding the transactions subsequent to 28 February 1974, and reversed regarding the transactions of 28 February 1974.

■ We hold that the court did not commit reversible error in deciding the agency issue. In a case where different reasonable inferences may be drawn from the evidence, the question of the nature and extent of the authority of an agent is one of fact to be determined by the trier of fact. *Nicholas v. Title and T. Co.*, 79 Or. 226, 154 P. 391 (S.Ct.Or.1916); 3 Am.Jur.2d *Agency* § 360; *cf. Baker v. Seaweard*, 63 Or. 350, 127 P. 961. The instant case was tried to the court sitting without a jury. Neither party has shown such insufficiency of evidence as to require reversal. Therefore, we affirm the trial court's ruling that Defendant Cudahy is liable only for the barley purchase contracts entered into on 28 February 1974, amounting to 4,500 tons at an average of $128 per ton.

## DAMAGES

The second and more difficult issue is whether the trial court correctly measured the damages. In order to understand the correct measure of damages, two sections of the Oregon Uniform Commercial Code must be reviewed: Section 2–706,[1] allowing re-

---

1. § 2–706. Seller's Resale Including Contract for Resale.

(1) Under the conditions stated in Section 2–703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this Article (Section 2–710), but less expenses saved in consequence of the buyer's breach.

(2) [R]esale may be at public or private sale including sale by way of one or more contracts to sell or of identification to an existing contract of the seller. Sale may be as a unit or in parcels and at any time and place and on any terms but every aspect of the sale including the method, manner, time, place and terms must be commercially reasonable. The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach.

sale damages, and Section 2–708(1),[2] allowing market value damages. The seller in the case at bar has asserted that Section 2–706 should be the measure of damages. Under Section 2–706, if the resale is made in good faith and in a commercially reasonable manner, the seller may recover the difference between the resale price and the contract price together with any incidental damages, but less expenses saved in consequence of the buyer's breach. Sale may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the sale including the method, manner, time, place and terms must be commercially reasonable. In addition, the resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach. Finally, if resale is at a private sale, as in the case at bar, the seller must give the buyer reasonable notification of his intention to resell.

As mentioned above, the trial court held that the defendant buyer should only be held liable for three of the fourteen repudiated contracts. The three contracts concerned 4,500 tons of barley, but the trial court found that two of the resale contracts,[3] amounting to 1,500 tons, had been executed before the required reasonable notice was given by the seller to the defendant buyer. After finding that this 1,500 tons had been sold without adequate notice, the trial court stated:[4]

> Under 72.7080, Coast can recover the difference between the contract price and the market price at the time and place for tender. In this case, however, Coast did not credit specific resale contracts to specific repudiated contracts. Due to this, Coast did not, nor could it, prove the market price at the time and place for tender as it related to these specific resale contracts. Coast, then, has not shown that it was damaged as to 1,500 tons of barley for which it otherwise could have recovered.
>
> As to the remaining 3,000 tons of barley, adequate notice was given and Coast is entitled to the damages which it can prove under ORS 72.7060.

The court went on to compute the damages:[5]

> The total contract price for the 3,000 tons of barley purchased on February 28 is $384,000 ($128.00 per ton average). After removing the first two sales for which inadequate notice was given, the market price for the next 3,000 tons at the time of the anticipatory repudiation was $363,475. Coast is entitled to recover the difference between these two figures or $20,525.

---

(3) Where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell.

\*     \*     \*     \*     \*     \*

(6) The seller is not accountable to the buyer for any profit made on any resale. . .

2. § 2–708. Seller's Damages for Non-acceptance or Repudiation.

(1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2–723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2–710), but less expenses saved in consequence of the buyer's breach.

3. PBF 125 on 12 June 1974 and PBF 126 on 11 June 1974; see plaintiff's Exhibit No. 15.

4. We quote this passage from the trial court's Memorandum only for the purpose of explaining how the trial court calculated its damages award. We do not agree that plaintiff cannot recover under Section 2–708. The trial court's error lies in its apparent belief that the "time and place for tender" is that specified in the resale contracts. On the contrary, the delivery terms in the resale contracts are irrelevant. The time and place for tender mentioned in Section 2–708 refers to the repudiated contracts.

5. We agree with plaintiff's contention that the trial court made a mathematical error in calculating damages under Section 2–706. However, as is discussed below, our damages figure is not based upon the trial court's computation and, therefore, it is not worthy of further comment.

Plaintiff contends that the trial court erred in holding, with respect to the first two resale contracts, that plaintiff failed to give reasonable notice of its intention to resell, in that defendant received notice by telephone, by mailgram, and by direct mail. Additionally, plaintiff avers that immediate sale was required by accruing demurrage charges and because some of the barley was in rail cars on track and in transit. Furthermore, plaintiff argues its sales were commercially reasonable, in good faith, and that the resold barley was properly identified to the repudiated contracts on a ton for ton basis. Finally, plaintiff argues that if it is found that damages cannot be calculated under a Section 2–706 resale approach, then damages should be measured under a Section 2–708 market value approach.

On the other hand, defendant argues that plaintiff failed to prove damages and is not entitled to a resale measure of damages. Defendant contends that plaintiff had a chance to sell the repudiated barley at higher prices than defendant would have paid and indeed seized this opportunity; yet through sales manipulations, fictional transactions, and disregard of the requisites of Section 2–706, plaintiff invented the claim that it suffered damages and in any event may not recover a resale measure of damages. It is further argued that plaintiff's resales were made neither in good faith nor in a commercially reasonable manner, and that the resale contracts were not reasonably identified to the repudiated contracts.

Several points are presented by defendant to support its contentions: (1) plaintiff charged defendant with costs for barley stored in a warehouse at Spokane, yet failed to credit defendant with any profit on the resale of that barley; (2) although plaintiff claims that 22 railroad cars of barley en route to the feedlot were included in the resales used to compute the damages— in fact, only ten of the cars were actually applied to plaintiff's resale damage calculation; (3) plaintiff failed to sell at reasonable prices because it sold prematurely while the market was at a temporary low, be-

cause over half the barley was sold at prices below the market price, and because plaintiff knowingly dumped all the barley on the market at once causing a depressive effect on prices, thereby failing to sell at a reasonable time; and (4) over half the barley plaintiff claims to have resold was merely a sham paper transaction with a related corporation, founded by plaintiff, and was cancelled nine days later by a re-purchase before any barley exchanged hands.

■ After reviewing the arguments and exhibits of both parties, we conclude that the trial court erred in allowing damages under Section 2–706 of the Oregon Uniform Commercial Code. In its 12 April 1976 Memorandum Opinion, the trial court insisted upon the reasonable notification requirement of Section 2–706, but failed to address the question of whether the other prerequisites had been fulfilled by the plaintiff. We find that, as a matter of law, the plaintiff did not satisfy the elements of good faith and commercial reasonableness, required in every aspect of every sale. The most striking example of commercial unreasonableness that suggests bad faith is the alleged resale contract between the plaintiff and a corporate purchaser entitled Montana Merchandisers, Inc. The total amount of barley involved in the repudiated contracts equals 10,343.11 tons. Of the 10,343.-11 tons resold by plaintiff, 5,293.11 tons were supposedly sold to Montana Merchandisers, Inc., on 19 June 1974, as part of a 6,000-ton transaction. The sale price was $100 per ton, although the pertinent market price was $105 per ton. Nine days later, on 28 June 1974, the plaintiff signed a contract to purchase an identical amount (6,000 tons) of barley from Montana Merchandisers, Inc. This purchase agreement for the identical amount of grain stated only a $0.25 per ton increase in price and the instrument negated the earlier sale before any grain exchanged hands and even before written confirmation of the 18 June sale was received by plaintiff from Montana Merchandisers, Inc. The trial court admitted defendant's

exhibit[6] showing what actually happened to the next 5,293.11 tons of barley that were sold by plaintiff after 28 June 1974. That exhibit reveals actual receipt of $133,-566 more than that reported by plaintiff as receipts from the alleged sale to Montana Merchandisers, Inc. The defendant has characterized this sale to Montana Merchandisers, Inc., as a fictitious "wash" sale designed to inflate plaintiff's damage claim. We agree. The uncontroverted evidence has established that the Montana Merchandisers transaction was little more than a paper contract apparently intended to serve only as a basis for calculating resale damages under Section 2–706. The commercial unreasonableness is obvious and raises questions of bad faith. Plaintiff contends that it was totally independent of Montana Merchandisers, Inc., because their relationship had terminated a year earlier. We are not persuaded. Furthermore, plaintiff argues that "a seller *can* resell to himself under UCC 2–706", citing for authority *Symonds v. Adler Restaurant Equipment Co.*, 10 U.C.C.Rept.Service 1179 (Okla.Ct.App.1971). However, *Symonds* deals with the law regarding *public* resales under Section 2–706 and the resales in the case at bar were *private* resales. Therefore, plaintiff's reliance on *Symonds* is misplaced.[7] As Professor Nordstrom comments:

> A defaulting buyer ought to pay for the loss he caused, but he should not also be required to pay for those losses which the seller brought on himself through a careless resale (or even a friendly resale to a relative or acquaintance designed to set damages as high as possible).

Nordstrom, *Handbook of the Law of Sales*, § 173, at 522 (1970).

We find these words quite apt and therefore hold that the commercial unreasonableness of the resale of over fifty per cent of the barley involved in the repudiated contracts is of such magnitude that we need not further examine whether other aspects[8] of the resales were in derogation of the safeguards required under Section 2–706. The plaintiff may not recover under Section 2–706.

The next question is whether the seller may then be allowed to recover market value damages under § 2–708(1). Official comment (2) of Section 2–706 states: "Failure to act properly under this section deprives the seller of the measure of damages here provided and relegates him to that provided in Section 2–708." *See also Wolpert v. Foster*, 21 U.C.C.Rept.Service 516 (Minn.S.Ct.1977). This comment will be followed by this court but, as noted in White and Summers' treatise,[9] the plaintiff-seller should not be allowed to obtain a greater amount in Section 2–708 damages than the seller actually lost:

> [W]e conclude that a seller who has resold at the time of trial should not be permitted to recover more under 2–708(1) than he could recover under 2–706. However, we would not cast the burden on the seller who sues under 2–708(1) to prove that 2–706 was less advantageous to him. Rather we would make it the buyer's burden to show that the seller had in fact resold, that this was not a lost volume case, and that 2–708(1) recovery would be greater than 2–706 recovery.

We adopt the White and Summers suggestion. In the case at bar, it is clear that the plaintiff, as a seller of grain on a commodity market, is not a volume seller of the kind contemplated in Section 2–708(2). Further-

---

**6.** Defendant's Exhibit No. 117.

**7.** Perhaps plaintiff's counsel should have followed the direction of the Oklahoma Supreme Court: "By direction of the Supreme Court, this opinion is not to be considered as precedent or authority and will not be published in the Pacific Reporter" 10 U.C.C.Rept.Service 1179.

**8.** *E. g.*, whether plaintiff properly identified the resale contracts to the repudiated contracts, and whether the plaintiff fulfilled its duty to realize as high a price as possible under the circumstances. *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3 (4th Cir. 1971).

**9.** White and Summers, *Handbook on the Uniform Commercial Code* (1972), pages 223, 224.

more, the evidence admitted without objection at trial shows that the plaintiff in fact resold, and plaintiff's Illustrative Charts upon Oral Argument supply this court with plaintiff's version of how damages should be calculated under Section 2–708(1). The remaining factors have been supplied by the defendant and they are the components for the calculation of damages plaintiff actually suffered from its attempt to resell and recover under Section 2–706. The following chart [10] was submitted by plaintiff to illustrate the amount received from the resale contracts:

RESALE CONTRACTS

| Contract Number | Date of Resale Contract | Purchaser on Resale | FOB Yakima Contract Price | Contract Amount in Tons | Value |
|---|---|---|---|---|---|
| PBF 125 | 6/12/74 | Western Farmers | $102.00 | 1,000 | $ 102,000.00 |
| PBF 126 | 6/11/74 | Wheatheart Northwest Ind. | 103.50 | 500 | 51,750.00 |
| PBF 191 | 6/18/74 | Cargill, Inc. | 104.50 | 550 | 57,475.00 |
| PBF 201 | 6/18/74 | General Mills, Inc. | 104.50 | 500 | 52,250.00 |
| PBF 203 | 6/18/74 | Continental Grain | 101.00 | 1,000 | 101,000.00 |
| PBF 207 | 6/18/74 | Continental Grain | 101.00 | 1,000 | 101,000.00 |
| PBF 209 | 6/19/74 | Wheatheart Northwest | 103.50 | 500 | 51,750.00 |
| PBF 226 | 6/19/74 | Montana Merchandisers | 100.00 | 5,293.11 | 529,311.00 |
| | | | | 10,343.11 | $1,046,536.00 |

Note: Contracts PBF 125, PBF 203, and PBF 207, were written on a FOB Coast basis. The contract prices above have been reduced by $4.00 per ton to adjust all resale contracts to a FOB Sunnyside basis.

This chart shows a value of $529,311.00 for the 5,293 tons of barley involved in the "wash" sale to Montana Merchandisers, Inc. Uncontroverted evidence supplied by defendant [11] shows that the receipts from plaintiff's next actual sales of 5,293.11 tons of barley following the Montana Merchandisers transaction amounted to $662,877.00. That is a difference of $133,566.00. Plaintiff had originally calculated its Section 2–706 damages as follows:

| | |
|---|---|
| Value of tons cancelled – | $1,227,403.85 |
| Value of tons resold – | 1,046,536.00 |
| | $ 180,867.65 |

If this $180,867.85 figure is reduced by the unreported actual receipt of $133,566.00, then by the uncontroverted evidence, plaintiff actually suffered a loss of only $47,-301.85, which would be the damages figure if damages could be measured under Section 2–706.

The market value damages for the 4,500 tons for which defendant is being held liable, are correctly calculated in plaintiff's Illustrative Charts upon Oral Argument: [12]

If, as Cudahy asserts, CTC's resales were all invalid, CTC's damages under 2–708 on the 4,500 tons compute as follows: [13]

10. Plaintiff's Exhibit No. 15.

11. Defendant's Exhibit No. 117. If plaintiff believes that it has presented evidence that controverts defendant's Exhibit No. 117, on remand, the district court may allow Coast an opportunity to reassert such evidence and, if necessary, the district court shall correct any error in our calculations.

12. The three contracts entered into on 28 February 1978, call for May, June and July delivery, respectively, without further specifying a date for delivery. The plaintiff's resale damages are based on the highest market value prices during the months in question; therefore, the defendant will not be allowed to complain of the lack of specific delivery dates. We will use bid prices in our market value calculations. However, if the defendant has as yet unseen authority to support its argument that offer prices should be used, defendant may present this information to the district court which will already be required to re-examine the incidental damage award.

13. The parties concede that 96.15 tons of the 4,500 involved were accepted and paid for by Cudahy.

| | | |
|---|---|---|
| Contract price – 4,403.85 T at $128/T – | | $563,692.80 |
| Market price – 1,403.85 T at $101 (5/31) – | | 141,788.85 |
| – 1,500 T at $104 (6/30) – | | 156,000.00 |
| – 1,500 T at $126 (7/30) – | | 189,000.00 |
| | | $486,788.85 |
| TOTAL DAMAGES – | | $ 76,903.95 |

■ If this court were to allow the full Section 2–708(1) measure of damages ($79,500), then plaintiff would receive a $32,198.15 windfall, which we will not sanction. Therefore, we hold that plaintiff is entitled to a compensatory damage award under Section 2–708(1), but only up to the amount of damages that could be recovered under Section 2–706, that is, plaintiff's actual losses. Plaintiff shall be granted a compensatory damage award of $47,301.85.

## INCIDENTAL DAMAGES

■ We hold no incidental damages may be recovered for the costs of any resales because of the fact that plaintiff failed to fulfill the requirements of Section 2–706. Regarding other expenses plaintiff claims as incidental damages, such as storage and transit costs, we remand this portion of the case for a hearing to determine the amount of actual incidental damages resulting from defendant's repudiation of the 4,500 tons.[14]

## ATTORNEY FEES

■ The trial court's finding of 24 May 1976, that neither party prevailed and that, therefore, neither party is entitled to attorney fees, is affirmed. Each of the fourteen contracts in dispute contains a clause providing for the plaintiff's attorney fees. However, O.R.S. 20.096 and 20.097 require these provisions to be interpreted as a mutual right to attorney fees dependent upon which party prevails. We find no error in the trial court's ruling. Therefore, each side will pay their own attorney fees and costs.

## INTEREST

■ A district court should be cautious in exercising its discretion to award prejudgment interest, which should not be imposed when its exaction would be inequitable. *Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct.

451, 7 L.Ed.2d 403 (1962); *Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 589 (3rd Cir. 1975).

In light of the fact that the incidental damage portion of this case must be remanded in any event, the district court should re-examine the matter of prejudgment interest, indicating its reasons for assessment if it should decide to make an award.

Likewise, with respect to the matter of the rate of interest, the district court should re-examine the percentage to be charged, specifically indicating its reasons in light of O.R.S. 82.010.

The trial court is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with this opinion.

---

14. We are inclined to award plaintiff the $2,483.92 in transit costs, but we are without sufficient information to determine actual storage and handling costs of the 4,403.85 tons of barley for which the defendant is being held liable.