[No. F007207. Fifth Dist. July 29, 1988.]

ALLIED GRAPE GROWERS, Plaintiff and Appellant, v.
BRONCO WINE COMPANY, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, II, III and VI.

COUNSEL

McCutcheon, Doyle, Brown & Enersen, Stephen Grant, John R. Reese, Stephen A. Zovickian and Sherri J. Conrad for Plaintiff and Appellant.

Furth, Fahrner, Bluemle & Mason, Frederick P. Furth, Thomas R. Fahrner, George F. Bishop, Kathleen Styles Rogers and Martin H. Myers for Defendant and Appellant.

OPINION

BALLANTYNE, J.—

## INTRODUCTION

Bronco Wine Company crushes grapes for use as wine. Allied Grape Growers is a cooperative corporation consisting of many grape growers in the business of supplying grapes to wineries. In 1981, Bronco and Allied entered into a contract for the supply and purchase of approximately 30,000 tons of red and white grapes per year for use in bulk wines.

A major dispute arose in 1982 when Bronco allegedly breached the contract by not accepting grapes or by downgrading grapes and paying lower prices for them. Allied eventually won its lawsuit with a jury award of approximately $3.4 million for its breach of contract claims. The jury was unable to reach a verdict on Allied's two fraud claims.

In a separate hearing conducted by the trial court on Allied's claim of unfair business practices, the trial court granted injunctive relief for Allied pursuant to Business and Professions Code section 17200. (Bronco's requests for a *judgment non obstante veredicto* and for a new trial were denied.)

On appeal Bronco contends that there is insufficient evidence to support the jury verdicts and that the trial court erred in not granting its motions for *judgment non obstante veredicto* or for a new trial. Bronco claims that there was juror misconduct and that the trial court erred in applying Business and Professions Code section 17200 as a matter of law. Allied cross-appeals on the theory that it was entitled to special late charges pursuant to Agricultural Code section 55881 for Bronco's late payment for those portions of the contract that it did honor.

## FACTS AND PROCEEDINGS BELOW

Because most of Bronco's contentions on appeal involve the sufficiency of evidence, we have abbreviated this statement of facts and discuss the pertinent facts in far greater detail below as they bear upon that particular issue.

Bronco and Allied first entered into a contractual relationship in 1978. In June of 1981 the contract was renewed for another three-year term. Under the terms of the agreement, Allied was to supply approximately 20,000 tons of Thompson seedless grapes and somewhere between 10,000 and 13,000 tons of other varieties each season between 1981 and 1984. Through the first year of the contract neither party had any complaints about the other's performance.

In 1982, however, two events tremendously undermined the expectations of the parties. First, the grape crop and crush were the largest to date in California history and there also was a glut of wine from foreign producers. Second, rainfall in the San Joaquin Valley during late September caused damage to the crop.

Bronco complained that the quality of the grapes being delivered in late September and early October was far below its standards. Bronco further complained that the grapes were below its sugar-content standards.

Allied contended at trial that Bronco had substantially overcontracted for Thompson seedless grapes in 1982. Allied complained that Bronco deliberately did not open its winery in Fresno until September 20 and did not open its winery in Ceres until September 28, despite its repeated pleas for Bronco to open its wineries earlier. When Bronco finally did open its plants, over half the grapes statewide had already been crushed. Also, according to Allied, rain in September was highly probable and everyone in the wine business knew that it would cause damage. Allied's president, Robert McInturf, was concerned at the late opening of the Bronco plants because it would take up to 30 days to harvest, transport and crush a 30,000-ton contract.

Allied contended at trial that Bronco's three-tiered quality program, initiated by Bronco in 1982, and Bronco's practice of downgrading its grapes breached the general contract standards agreed to by the parties. Allied contended that the practices were totally arbitrary, that its grapes met contract standards including sugar content, and that Bronco's purpose in engaging in these practices was that it had purchased more grapes to crush than it had contracts to sell to other wineries.

Allied succeeded in delivering approximately 17,500 tons of Thompson grapes under the contract. Bronco paid an average price of $103 per ton. Allied contended that its grapes met contract standards and that it was entitled to $150 per ton because the Thompson grapes averaged 21.1 degrees Brix.

On March 16, 1983, Bronco repudiated its contract with Allied. Because there was no other market for its grapes, other than the Bronco contract, Allied formed a subsidiary corporation called ISC to purchase the grapes. Allied contended that the market value of its grapes in 1983 was $100 per ton and that ISC could only purchase the grapes for $85 per ton, for a loss of $15 per ton.

The jury awarded $2.65 million for Bronco's breach of contract in 1982. It awarded another $744,658 for Bronco's breach of contract in 1983. The trial court further awarded prejudgment interest and granted an injunction on Bronco's business practices pursuant to Business and Professions Code section 17200 after a court hearing without a jury.

DISCUSSION

I.-III.*

. . . . . . . . . . . . . . . . . . . . . . .

IV.

ESTOPPEL AND THE STATUTE OF FRAUDS UNDER THE CALIFORNIA UNIFORM COMMERCIAL CODE.

█ Bronco contests the jury's award of damages for undelivered Carnelian grapes. The original written contract between the parties does not include Carnelians. Allied claims there was an oral contract for delivery of 850 tons of Carnelians. Bronco accepted and paid for one load of Carnelian grapes and rejected deliveries of the rest. Bronco argues, however, that under the California Uniform Commercial Code it is obligated to pay for only those grapes delivered and accepted. Allied replies that partial performance takes the case outside the statute of frauds.

█ California Uniform Commercial Code section 2201 (hereafter section 2201) creates a statute of frauds for the sale of all goods with the value of $500 or more. This changed the common law rule of many jurisdictions that prevented operation of the statute of frauds in contracts for the sale of goods. (See *Varnell* v. *Henry M. Milgrom, Inc.* (1985) 78 N.C.App. 451 [337 S.E.2d 616, 618-619]; *Maryland Supreme Corp.* v. *Blake Co.* (1977) 279 Md. 531 [369 A.2d 1017, 1028, fn. 5].) Without a written memorandum between the parties, the California Uniform Commercial Code's statute of frauds

---

*See footnote, *ante,* page 432.

will still not bar enforcement of an oral contract under two instances set forth in subdivision (3) of section 2201, which reads: "(3) A contract which does not satisfy the requirements of subdivision (1) but which is valid in other respects is enforceable [¶] (a) If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or [¶] (c) With respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2606)." (*Note*: Subdivision (b) was not enacted in California.)

Allied's assertion that partial performance takes an oral contract outside the statute of frauds is not supported by any California case authority. The California Uniform Commercial Code was not operative until June 1, 1965, and it does not have retroactive application. (Cal. U. Com. Code, § 10101.) The disputes in the three authorities cited by Allied predate the California Uniform Commercial Code and rely upon the California Civil Code as authority for the proposition that partial performance takes an oral contract outside the statute of frauds even if the partial performance does not complete the performing party's obligations under the contract. (*Nelson* v. *Specialty Records, Inc.* (1970) 11 Cal.App.3d 126, 141 [89 Cal.Rptr. 540]; *Sloan* v. *Hiatt* (1966) 245 Cal.App.2d 926, 933 [54 Cal.Rptr. 351]; *Price* v. *McConnell* (1960) 184 Cal.App.2d 660, 667 [7 Cal.Rptr. 695].)

In fact, the *Sloan* case actually indicates that partial performance is limited in application under section 2201, subdivision (3)(c), and the Official Code Comments. (245 Cal.App.2d at p. 933.) Official comment No. 2 limits the buyer's obligation to make a payment under the oral contract to only those goods which are actually received. Comment No. 2 states: "2. 'Partial performance' as a substitute for the required memorandum can validate the contract only for the goods which have been accepted or for which payment has been made and accepted.

"Receipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists. If the court can make a just apportionment, therefore, the agreed price of any goods actually delivered can be recovered without a writing or, if the price has been paid, the seller can be forced to deliver an apportionable part of the goods. The overt actions of the parties make admissible evidence of the other terms of the contract necessary to a just apportionment. This is true even though the actions of the parties are not in themselves inconsis-

tent with a different transaction such as a consignment for resale or a mere loan of money.

"Part performance by the buyer requires the delivery of something by him that is accepted by the seller as such performance. Thus, part payment may be made by money or check, accepted by the seller. If the agreed price consists of goods or services, then they must also have been delivered and accepted."

The express language of subdivision (3)(c) of section 2201 also appears to limit recovery to payment for those goods actually received and accepted. The number of reported decisions in California interpreting section 2201, subdivision (3)(c), are few. In *Dairyman's Cooperative Creamery Assn.* v. *Leipold* (1973) 34 Cal.App.3d 184, 188 [109 Cal.Rptr. 753], this court recognized that the doctrine of part performance applied where a broker acted on behalf of a buyer who received and accepted a specific quantity of powdered milk.

In *Lockwood* v. *Smigel* (1971) 18 Cal.App.3d 800 [96 Cal.Rptr. 289], the court recognized that partial payment for a single automobile evidenced the existence of an oral agreement between the parties. The *Lockwood* court, however, clearly held that it was because partial payment was made for a single unit (one automobile), that the doctrine of partial performance took the case outside the statute of frauds. The *Lockwood* court carefully quoted and considered Official Uniform Commercial Comment No. 2, in footnote 3 of the opinion. (18 Cal.App.3d at p. 803.) The court then went on to observe that: "The policies of the law are well served by enforcement of the contract which is alleged in this case. Where there is a part payment instead of a memorandum, this fact evidences the existence of a contract and identifies the party to be charged—i.e., the seller who received the money. Where the buyer is claiming to have purchased no more than one unit, there can be no dispute over quantity. The possibility that other terms of the bargain may be disputed is not a ground for nonenforcement, since a memorandum which satisfies the statute need not state all of the terms fully or accurately. The statutory policy which under the old law permitted the enforcement of oral contracts upon proof of part payment is equally sound under the new code, as applied to the sale of an indivisible unit." (18 Cal.App.3d at p. 804.)

*Lockwood* did not have to confront the issue of payment for one load of grapes where the oral contract called for a much larger quantity than actually delivered and accepted. *Lockwood's* dictum, however, clearly acknowledges the distinction between partial performance under the Civil Code and partial performance under the California Uniform Commercial Code. Hence, partial performance under the California Uniform Commer-

cial Code entitles the seller to payment only for those goods received and accepted by the buyer.

Other jurisdictions also limit the doctrine of partial performance under the Uniform Commercial Code to only that part of the oral agreement actually performed by the parties. (*Howard Const. Co.* v. *Jeff-Cole Quarries, Inc.* (Mo.App. 1983) 669 S.W.2d 221, 230-231; *Colorado Carpet Installation* v. *Palermo* (Colo.App. 1982) 647 P.2d 686, 687-688; *In re Estate of Nelsen* (1981) 209 Neb. 730 [311 N.W.2d 508, 509-510].) Before concluding, however, that Allied's damage claim is limited by the statute of frauds to only those Carnelian grapes actually delivered and accepted, there is another exception to the statute of frauds in the Uniform Commercial Code we must consider.

California Uniform Commercial Code section 1103 states that principles of law and equity not otherwise covered by the code shall supplement the code's provisions.[8] In their Commercial Code treatise, James White and Robert Summers propose that the equitable principle of promissory estoppel survives in the California Uniform Commercial Code through section 1103. Estoppel can act as one further exception to imposition of the statute of frauds. They argue that section 1203, which imposes an obligation on every contract to act in good faith, further supports their contention that equitable estoppel survives enactment under the Uniform Commercial Code.[9] Where a party to an oral agreement misleads another, even innocently, sections 1103 and 1203 can be used to impose equitable estoppel against the transgressing party. (White & Summers, Uniform Com. Code (2d ed. 1980) § 2-6, pp. 68-70.)

No California case directly applies the doctrine of promissory estoppel as an additional exception to the statute of frauds provision found in California Uniform Commercial Code section 2201. One federal case interpreting California law concluded that California courts would not apply an estoppel theory to defeat the statute of frauds.

*C.R. Fedrick, Inc.* v. *Borg-Warner Corp.* (9th Cir. 1977) 552 F.2d 852, 856-858, found that application of equitable estoppel to the statute of frauds would nullify the statute of frauds. Somewhat inconsistently, the case then

---

[8] California Uniform Commercial Code section 1103 provides: "Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

[9] California Uniform Commercial Code section 1203 states: "Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement."

analyzed estoppel as applied in California and concluded that under the facts of that case the seller had not suffered an unconscionable injury.

The *C.R. Fedrick* decision completely failed to consider the effect of California Uniform Commercial Code section 1103 and the fact that estoppel survives as a doctrine under the California Uniform Commercial Code. In conclusory fashion, the decision finds that the statute of frauds is eviscerated if a court applies estoppel. The *C.R. Fedrick* court's conclusion is not supported by at least one California authority that it failed to consider in its analysis.

*Distribu-Dor, Inc.* v. *Karadanis* (1970) 11 Cal.App.3d 463 [90 Cal.Rptr. 231] held that an oral contract for the sale of mirrors that had been cut and prepared for a specific job was not barred by the statute of frauds. (*Id.* at p. 471.) The court analyzed the problem under section 2201, subdivision (3)(a), the statute of frauds exception for goods specially produced for a specific buyer. Although it did not expressly rely upon California Uniform Commercial Code section 1103, the *Distribu-Dor* court reasoned that equitable principles survived enactment of the Uniform Commercial Code in California: "Commercial Code section 2201, subdivision (3)(a), is clearly a codification of one aspect of the general rule which does not permit a party to plead the bar of the statute of frauds if he represents to another that he intends to enter an oral contract, and the other person changes his position in reliance. [Citations.]

"Strict adherence to the statute of frauds has been abandoned in favor of certain limited exceptions to promote equity and fair dealing between parties. Plaintiff had a valid contract for sale of the mirrors." (11 Cal.App.3d at p. 469, fn. omitted.)

Furthermore, the great weight of authority from sister state jurisdictions holds that estoppel can be applied to overcome the Uniform Commercial Code's statute of frauds provision as long as a court is not enforcing a mere oral promise. There must be some form of detrimental reliance. We have found 14 jurisdictions that recognize estoppel as an additional exception to the statute of frauds. (See *Potter* v. *Hatter Farms, Inc.* (1982) 56 Ore.App. 254, [641 P.2d 628, 632-633]; *Northwest Potato Sales, Inc.* v. *Beck* (1984) 208 Mont. 310, [678 P.2d 1138, 1140-1141]; *Ralston Purina Co.* v. *McCollum* (1981) 271 Ark. 840 [611 S.W.2d 201, 203]; *Farmers Elevator Co. of Elk Point* v. *Lyle* (1976) 90 S.D. 86 [238 N.W.2d 290, 293-294]; *Farmers Cooperative Ass'n. of Churches Ferry* v. *Cole* (N.D. 1976) 239 N.W.2d 808, 812-813; *Meylor* v. *Brown* (Iowa 1979) 281 N.W.2d 632, 635; *Sacred Heart Farms Cooperative Elevator* v. *Johnson* (1975) 305 Minn. 324 [232 N.W.2d 921, 923]; *Citizens State Bank* v. *Peoples Bank* (Ind.App. 1985) 475 N.E.2d

324, 327; *Atlantic Wholesale Co.* v. *Solondz* (1984) 283 S.C. 36 [320 S.E.2d 720, 722-724]; *Porter* v. *Wertz* (1979) 68 App.Div. 141 [416 N.Y.S.2d 254, 258], affirmed *Porter* v. *Wertz* (1981) 53 N.Y.2d 696 [439 N.Y.S.2d. 105, 106-107, 421 N.E.2d 500]; *Varnell* v. *Henry M. Milgrom, Inc., supra,* 337 S.E.2d 616, 618-619; *Decatur Cooperative Association* v. *Urban* (1976) 219 Kan. 171, 176-180 [547 P.2d 323, 329-330]; *Maryland Supreme Corporation* v. *Blake Co., supra,* 279 Md. 531, 548-550 [369 A.2d 1017, 1027-1029]; *Fairway Mach. Sales Co.* v. *Continental Motors Corp.* (1972) 40 Mich.App. 270, 272 [198 N.W.2d 757, 757-758].)

We have found only four jurisdictions that have declined to apply equitable estoppel as an exception to the Uniform Commercial Code's statute of frauds. (*Lige Dickson Co.* v. *Union Oil Co. of Cal.* (1981) 96 Wn.2d 291 [635 P.2d 103, 107]; *C. G. Cambell & Son, Inc.* v. *Comdeq Corp.* (Ky.App. 1979) 586 S.W. 2d 40, 41; *Anderson Const. Co., Inc.* v. *Lyon Metal Prod.* (Miss. 1979) 370 So.2d 935, 937; *Cox* v. *Cox* (1974) 292 Ala. 106 [289 So.2d 609, 613].)

The majority rule is the better-reasoned rule. It does not nullify the statute of frauds because the elements of equitable estoppel must still be proven. ■ In California, the doctrine of estoppel is proven where one party suffers an unconscionable injury if the statute of frauds is asserted to prevent enforcement of oral contracts. (*Irving Tier Co.* v. *Griffin* (1966) 244 Cal.App.2d 852, 863-864 [53 Cal.Rptr. 469].) Unconscionable injury results from denying enforcement of a contract after one party is induced by another party to seriously change position relying upon the oral agreement. It also occurs in cases of unjust enrichment. (*Monarco* v. *Lo Greco* (1950) 35 Cal.2d 621, 623-624 [220 P.2d 737].)

■ The jury in the instant action did hear evidence that Bronco breached its oral agreement to purchase Carnelian grapes from Allied. Allied also showed that it changed position to its detriment when it entered into the oral contract for the sale of Carnelians. Allied originally had a contract with United Vintners who agreed to purchase 850 tons of Carnelians from Allied. Allied had to receive special permission from Bob Rossi of United Vintners to sell its Carnelian grapes to Bronco instead. By the time Bronco started to reject loads of Carnelians, it had already rained heavily and grapes were rotting in the fields. Bronco refused to schedule the delivery of Carnelian grapes to its plants.

The jury was carefully instructed that it had to find that Allied was induced by Bronco to change its position in reliance on the oral contract for the sale of Carnelians *and* that Allied would suffer unconscionable injury if enforcement of the contract against Bronco was denied. The jury was also

instructed that it had to find all the elements of a contract, whether it was oral or written, before it could award damages.

The jury had more than substantial evidence from which it could infer both a change of position and unconscionable injury. Allied switched its position with regard to its original contract with United Vintners relying upon Bronco's assurances. Given the weather conditions, the highly perishable nature of the grapes, and Bronco's last-minute changes in scheduling, the jury could easily infer that it was too late for Allied to resell the Carnelians to United Vintners or others. This was especially true given the glut of grapes on the market in 1982. (See *Mosekian* v. *Davis Canning Co.* (1964) 229 Cal.App.2d 118, 123-124 [40 Cal.Rptr. 157].)

There is substantial evidence that Allied's loss was unconscionable given these facts. The statute of frauds should not be used in this instance to defeat the oral agreement reached by the parties in this case. The verdict awarding damages for Bronco's rejection of Carnelian grapes was appropriate.

## V.

### DAMAGES FOR 1983 CROP.

Bronco repudiated its contract with Allied in March of 1983. Allied, unable to find any purchaser for its grapes, created a subsidiary corporation called ISC to purchase the 1983 grape crop. The prevailing price for grapes in 1983 was $100 per ton. The value of the grapes to ISC was only $70 per ton. To minimize damage to growers and to ISC, the loss of $30 per ton was split between ISC and the growers. ISC bought the grapes for $85 per ton. Its loss was the same as the growers' loss, or $15 per ton.

Bronco makes three contentions on appeal. It claims that Allied and ISC operated as a single entity, making a resale to itself legally impossible under California Uniform Commercial Code section 2706. Bronco also claims that the resale of the 1983 Thompsons to ISC was not commercially reasonable. Finally, Bronco contends that Allied failed to comply with the notification requirements of section 2706.

A. *Commercial reasonableness of resale to an affiliated entity.*

Prominent commentators note that California Uniform Commercial Code section 2706 basically requires that all resales be conducted in a commercially reasonable manner and that sellers act in good faith. (White & Summers, Uniform Com. Code, *supra*, § 7-6, pp. 265-266.) The express

provisions of the code section and the official comments to the section do *not* prohibit resales of goods to affiliated entities and they do *not* state that such sales are per se commercially unreasonable.

■ Bronco relies on only two authorities interpreting California Uniform Commercial Code section 2706 for the proposition that all resales to affiliated entities are commercially unreasonable. In *Afram Export Corp.* v. *Metallurgiki Halyps, S.A.* (7th Cir. 1985) 772 F.2d 1358, a seller of scrap metal sold scrap to its affiliate after the buyer backed out of the transaction. The resale turned out to be nothing more than a bookkeeping transaction. The evidence at trial showed that the scrap was sold at a higher price several months later than the sale price to the affiliate. The court found that the sale price on the open market was a better indicator of the true market value and the seller's actual loss than the seller's resale to its own affiliate. (*Id.* at pp. 1367-1368.)

In *Coast Trading Co.* v. *Cudahy Co.* (9th Cir. 1979) 592 F.2d 1074, a grain seller resold approximately one-half of a 10,000-ton grain contract rejected by the buyer to a Montana merchandiser. The evidence showed that although the market price was $105 per ton, the resale was for only $100 per ton to the Montana merchandiser. Nine days later the Montana company resold the grain back to the original seller for a profit of only 25 cents per ton. The plaintiff seller eventually sold the grain for a $133,566 profit. The seller's transaction with the Montana company was held to be commercially unreasonable and in bad faith. (*Id.* at pp. 1080-1081.)

Neither case holds that the resale of goods to an affiliate is commercially unreasonable. Both cases find that the resale to an affiliate or closely related company was a sham because the transactions were purely paper transactions and because the sellers eventually sold their goods at higher prices on the open market than they received from the initial resale. The sellers in the *Afram* and *Coast Trading* cases were not acting in good faith during resale. Rather than mitigating their damages, they were inflating their damages with the phony transfer of goods to obtain a dual recovery of damages. The sellers were first receiving extra funds from the more profitable resale of goods after sham transfers, and then by way of judgment from the defaulting buyer based on the price obtained from the sham resale.

The substantial evidence tendered by Allied at trial showed that the prevailing market price for Allied's 1983 crop was $100 per ton. The grapes were sold to ISC, which was the only buyer Allied could find, for $85 per ton. Although the grapes only had a value to ISC of $70 per ton, Allied did not seek damages calculated at the total loss, which was $30 per ton. It limited its damage claim to the growers' loss based on the difference be-

tween what its contract would have been with Bronco ($100 per ton) and what it actually received from ISC ($85 per ton).

The sale to ISC was consummated only as a last resort. Allied tried a number of times to sell its grapes to other wineries. It searched extensively for other buyers but there was no market for grapes not already under contract. Allied tried several times to get Bronco to honor its contract. In mid-August of 1983 Bronco adamantly refused to accept any Allied grapes. Because of the glut of grapes from 1982, there was no market for unsold grapes. Without the ISC transaction, Allied's only options were to let its grapes rot in the field, causing a loss of $100 per ton, or to sell its grapes to an alcohol distiller which would not even cover picking and harvesting costs.

Without any other outlet, Allied's only other option was to create ISC and to attempt to market its own wines. ISC had no marketing plan for bulk wines when it was created. It was originally conceived as a producer of finer bottle wines.

This transaction is not even remotely comparable to those found in *Afram* and *Coast Trading.* In those cases, there was an actual market for the goods being sold. Here, in sharp contrast, there was no market for Allied's product outside its contract with Bronco unless it could sell its product to an affiliate.

Although ISC was an affiliated entity, its sole purpose was to attempt to mitigate the growers' losses. Without ISC's purchase of Allied's 1983 grape crop, growers would have lost $100 per ton (less their saved harvesting and transportation costs) rather than a loss of $15 per ton. If the ISC resale was truly a sham, one is left to wonder why Allied did not bring suit to recover $30 per ton for the grapes since the actual value of the grapes to ISC was only $70 per ton.

Unlike the transactions in *Afram* and *Coast Trading,* Allied's resale to ISC actually worked to mitigate Bronco's damages. The sale, under the depressed conditions existing for grapes in 1983 was commercially reasonable and executed in good faith.[10]

---

[10]We have not addressed Bronco's analogy to cases interpreting Uniform Commercial Code section 9504, the section governing resale by secured creditors. As White and Summers point out, the debtor in 9504 cases is usually "down at the heel." Cases brought under section 2706, in contrast, usually involve astute businessmen, which is clearly the situation in the instant case. Courts tend to scrutinize section 9504 transactions with more care than section 2706 cases. (Summers & White, Uniform Com. Code, *supra,* § 7-6, pp. 267-268.) For instance, section 2706, subdivision (6), states that the seller need not account for any profits on

### B.   *Notice of resale.*

To receive damages pursuant to section 2706 based on the difference between the contract price and the actual resale price, the seller must notify the buyer of its intent to resell if the sale is a private sale.[11]   ▋   Bronco argues that even though it repudiated the contract, Allied was still obligated to notify Bronco of a private resale pursuant to subdivision (3) of section 2706. Bronco's authority for this contention is *Anheuser* v. *Oswald Refractories Co., Inc.* (Mo.App. 1976) 541 S.W.2d 706.

The *Anheuser* decision did not reach or discuss the issue of whether the buyer who repudiates a contract is still entitled to notice of a resale under section 2706, subdivision (3). *Anheuser* merely follows the great weight of authority holding that the seller must plead and prove compliance with the notice requirements of section 2706. (541 S.W.2d at pp. 711-712.)

We need not resolve here the issue of whether a defaulting buyer repudiating a contract is entitled to notice of resale by the seller under section 2706. One vital fact remains absolutely undisputed. Allied sent Bronco notice in a legal pleading related to this litigation that it intended to resell the 1983 crop.   ▋▋   Bronco received notice before the crop was resold.[12] Bronco does not dispute that it received sufficient notice that satisfied the requirements of section 2706, subdivision (3). Instead, it argues that it is entitled to a retrial because the jury did not hear evidence that

---

resale, whereas section 9504, subdivision (2), requires that the creditor advance any profit from the resale to the debtor.

[11] California Uniform Commercial Code section 2706, subdivision (3), states that:
"(3)   Where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell."

[12] On August 8, 1983, Allied filed a motion for partial summary judgment against Bronco. This action had already been filed on December 28, 1982. The declaration of Robert McInturf, attached to the motion, states that since March 13, 1983, McInturf had attempted to sell the 1983 crop it had contracted to sell to Bronco to eight other wineries without success. Where a party appears in an action, notice of any motion must be to that party's counsel of record. (Code Civ. Proc., § 1015; *Linforth* v. *White* (1900) 129 Cal. 188, 190 [61 P. 910]; *Reynolds* v. *Reynolds* (1943) 21 Cal.2d 580, 583 [134 P.2d 251]; 6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 18, pp. 338-339.) Notice of a motion served upon a party's counsel is imputed to the party. (*Straw* v. *Pacific Tel. & Tel. Co.* (1961) 189 Cal.App.2d 270, 273 [11 Cal.Rptr. 155].) Both Bronco and its counsel had notice of the motion and the content of the motion. Notice of a fact to an agent is deemed to be notice of that fact to the principal as well. (Civ. Code, § 2332.) Actual notice of a fact to a litigant's attorney is imputed to the litigant. (*Wittenbrock* v. *Parker* (1894) 102 Cal. 93, 99-104 [36 P. 374]; *Rauer* v. *Hertweck* (1917) 175 Cal. 278, 281 [165 P. 946]; *Lazzarevich* v. *Lazzarevich* (1952) 39 Cal.2d 48, 50 [244 P.2d 1]; *Estate of Cantor* (1974) 39 Cal.App.3d 544, 549 [114 Cal.Rptr. 160].) Allied's notice to Bronco of its intent to sell the 1983 crop to other buyers through Allied's motion for partial summary judgment constituted actual notice to Bronco, through its agent-attorney, of the fact that Allied was going to sell the 1983 crop to a winery other than Bronco.

Bronco received actual notice and that Allied failed to plead and prove compliance with subdivision (3) of section 2706.

This argument must unequivocally fail under California law. No purpose would be served in retrying this case so that Allied's counsel could submit evidence to the jury that Bronco received actual notice of Allied's intent to resell the 1983 crop. Because Bronco received the notice, it was not prejudiced by Allied's failure to actually prove the point at trial. ■ A retrial based on harmless error violates the requirement of prejudice set forth in California Constitution, article VI, section 13. (*Mosesian* v. *Pennwalt Corporation* (1987) 191 Cal.App.3d 851, 859, 865-866 [236 Cal.Rptr. 778].) ■ Given the overwhelming weight of evidence in support of the verdict, in conjunction with the fact that Bronco received actual notice of Allied's intent to resell, the only conceivable purpose that would be served in reversing and remanding this issue to the trial court for a new trial would be to greatly increase litigation expense and unnecessarily burden the judicial system. This ground for appeal is rejected.

## VI.*

. . . . . . . . . . . . . . . . . .

## VII.

VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200.

Allied's eighth cause of action against Bronco was based on section 17200 of the Business and Professions Code. Allied alleged that Bronco's practice of downgrading certain grapes in 1982 constituted an "unlawful, unfair or fraudulent business practice." Business and Professions Code section 17200 (hereafter section 17200) provides as follows: "As used in this chapter, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

Bronco contends that the 1982 grape purchase transaction between Allied and Bronco does not constitute a violation of section 17200 because Bronco is a mere buyer and not a seller. Bronco further claims that its downgrading activity was not fraudulent within the meaning of section 17200 because there was no evidence that its activity had any tendency to

---

* See footnote, *ante*, page 432.

induce Allied or others to enter sales transactions. Bronco claims that its activity is not unfair because no reported case has found that the activity is unfair. Finally, Bronco contends that its violation of section 17200 is not a "business practice" because the activity herein is the isolated act of one contract with Allied Grape Growers.

Bronco's first and third contentions border on the frivolous. ■ First, nothing in section 17200 limits that section from being applied to a buyer or anyone else. (See *People* v. *Toomey* (1985) 157 Cal.App.3d 1, 19-20 [203 Cal.Rptr. 642]; *Hernandez* v. *Atlantic Finance Co.* (1980) 105 Cal.App.3d 65, 80-81 [164 Cal.Rptr. 279].) The Supreme Court has recognized that the predecessor to section 17200, Civil Code section 3369, is identical. (*Bondanza* v. *Peninsula Hospital & Medical Center* (1979) 23 Cal.3d 260, 264-266 [152 Cal.Rptr. 446, 590 P.2d 22].) Interpreting Civil Code section 3369, the California Supreme Court expanded the scope of that section beyond commercial transactions between competitors to the general public in the seminal decision of *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94 [101 Cal.Rptr. 745, 496 P.2d 817]. In a crucial passage of the decision, the Supreme Court found that section 3369 could be expanded and broadly applied. Contrary to Bronco's contention on appeal, *Barquis* held that a deceptive practice need only be unlawful or unfair or deceptive. The relevant discussion in this decision is as follows: "We conclude that in a society which enlists a variety of psychological and advertising stimulants to induce the consumption of goods, consumers, rather than competitors, need the greatest protection from sharp business practices. (Cf. *Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 807-808 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513].) Given the terms of the section, the purpose of the enactment and the controlling precedent, we reject defendant's suggested limitation of section 3369 to 'anti-competitive' business practices.

"Defendant additionally contends, however, that even if section 3369 is not limited to 'competitive injuries,' the section's proscription of 'unfair competition' should not be read so broadly so as to include the agency's alleged misfiling practice; that, instead, the provision be confined to more traditional 'deceptive' or 'fraudulent' conduct, conduct sharing at least some of the common features of misrepresentation that characterized the precedent of 'unfair competition.' We recognize that most of the cases arising under section 3369 to date have challenged 'business practices' in which a business enterprise was presenting itself, or its 'merchandise,' to the public in a deceptive manner so as to defraud consumers (see, e.g., *Academy of Motion Picture, etc.* v. *Benson* (1940) 15 Cal.2d 685 . . .; *American Philatelic Soc.* v. *Claibourne* (1935) 3 Cal.2d 689 . . .) and also that these decisions frequently refer to the 'essence' of section 3369 as the protection

from any conduct likely to deceive the consumer. (See, e.g., *West* v. *Lind* (1960) 186 Cal.App.2d 563, 567 . . . .)

"The language of section 3369, however, does not limit its coverage to such 'deceptive' practices, but instead explicitly extends to any 'unlawful, unfair *or* deceptive business practice'; the Legislature, in our view, intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur. Indeed, although most precedents under section 3369 have arisen in a 'deceptive' practice framework, even these decisions have frequently noted that the section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable ' "new schemes which the fertility of man's invention would contrive." ' (*American Philatelic Soc.* v. *Claibourne* (1935) 3 Cal.2d 689, 698 . . . .) As the *Claibourne* court observed: 'When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one. There is a maxim as old as law that there can be no right without a remedy, and in searching for a precise precedent, an equity court must not lose sight, not only of its power, but of its duty to arrive at a just solution of the problem.' (3 Cal.2d at pp. 698-699; see, *Ojala* v. *Bohlin* (1960) 178 Cal.App.2d 292, 301 . . .; accord, *FTC* v. *The Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 240 . . . .) With respect to 'unlawful' or 'unfair' business practices, section 3369 specifically grants our courts that power." (7 Cal.3d at pp. 111-112, fn. omitted.)

Thus, nothing in the history of section 17200 prevents an action being brought against a seller. Nothing in the section requires that there be a reported case in advance of an unfair practice holding the practice to be unfair. In its fourth contention, Bronco appears to be contending that section 17200 is analogous to a criminal code section and that it is entitled to more clearly defined notice of what conduct is prohibited by the statute. This contention has been raised before and rejected by both the California Supreme Court and Courts of Appeal. (See *Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 161 [181 Cal.Rptr. 784, 642 P.2d 1305]; *People* v. *Toomey, supra,* 157 Cal.App.3d 1, 17-18; *People* v. *Witzerman* (1972) 29 Cal.App.3d 169, 176-177 [105 Cal.Rptr. 284].)

■ The trial court found that Bronco's program was both unfair and fraudulent. In its second claim of error, Bronco appears to be contending that its business practices cannot be fraudulent within the context of a contractual relationship under section 17200. Bronco contends that there was no showing at trial that Allied was induced into entering the sales transaction by Bronco misrepresentations. The trial court noted in its state-

ment of decision that Bronco's downgrading practice violated Food and Agricultural Code sections 55872, 55878 and 55879. The trial court found that the downgrading practice was fraudulent because it permitted Bronco to pay far less than its primary price program of $150 per ton which deceived growers.

■■■ To state a cause of action for injunctive relief under section 17200, it is not necessary to make allegations of actual deception, reliance and damage. (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660].) Bronco wants this court to overturn the trial court's findings because there was no showing of actual fraud in the trial below. Bronco appears to assert that violations of section 17200 must be both fraudulent *and* unfair. There need not, however, be a showing of actual fraud. The test under section 17200 is that a practice merely be unfair. (See *Barquis* v. *Merchants Collection Assn., supra,* 7 Cal.3d 94, 111-112; *Motors, Inc.* v. *Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740-741 [162 Cal.Rptr. 543].) ■■■ Thus we need not analyze whether particular growers were deceived into entering the contract with Bronco. Bronco's downgrading practice was manifestly unfair. The evidence unequivocally shows that Bronco was attempting to play the market when it overcontracted with growers, including Allied, to maximize its potential gains in case 1982 demands for bulk wines were as high as they were in 1981. Bronco overcontracted for the purchase of grapes in a year that was marked by a glut of grapes on the market. Its downgrading practice was unconscionable. Allied does not have to show it was illegally induced into the contract to state a claim under section 17200. It was clearly unfair as unfairness is defined by the case law in section 17200. There is no merit to this contention on appeal. Even if the trial court incorrectly found the downgrading practice to be fraudulent, its holding will be sustained on appeal if it is correct on any theory. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10]; *Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 211 [223 Cal.Rptr. 645].)

Bronco's strongest claim is that there was no business practice which violated section 17200. Under this theory, Bronco contends that because Allied was a single entity operating under a single contract with Bronco, it is impossible as a matter of law for Allied to show that Bronco's downgrading policies constituted a "business practice" as required by section 17200. Bronco cites no case law in support of this contention other than its reference to the statute itself.

First, even though Allied is a single entity in terms of its contract with Bronco, the parties were well aware that Allied is a cooperative. The coop-

erative consisted of over 1,000 growers, 100 of whom were damaged from this transaction. Fifty of these growers testified at trial. Quite simply, there were multiple victims suffering under Bronco's downgrading scheme. From the fact that Bronco arbitrarily scheduled growers to deliver their grapes at specific times, and even to the plant furthest away from a grower's district, it is possible to infer that Bronco was well aware that it was inflicting damage to many different growers.

Also, Bronco's actions occurred over the span of nearly a month in September and October of 1982. Bronco's physical act of downgrading grapes, and then later of mixing them all together, did not occur at one time. Rather, it occurred during the course of hundreds of deliveries of grapes to Bronco's Fresno and Ceres plants. There were a multitude of individual acts, many arbitrary, of rejecting and downgrading grapes.

Finally, there was evidence at trial that Bronco not only downgraded grapes from Allied growers, but from non-Allied growers as well. Through the testimony of John Scott Bristol, a certified public accountant, Allied examined and analyzed documents from Bronco Winery showing that non-Allied grapes were also placed improperly into Bronco's substandard program. There was clearly evidence at trial from which the trial court could infer that there was a pattern or practice of downgrading that affected more than one victim. We also note that in no case cited by either party is it indicated that a business practice had to affect more than one victim. There is nothing in the word "practice" that necessarily limits section 17200 cases to those actions involving multiple victims. However, we need not reach this issue here, because Allied is a cooperative comprised of over 1,000 growers, many of whom were victims, and there was also evidence at trial that there were non-Allied victims of Bronco's downgrading scheme.

Bronco's final contention regarding section 17200 is that the trial court improperly granted injunctive relief against Bronco in addition to Allied's damage awards. Bronco claims that Allied was not entitled to obtain the equitable remedy of injunction where there is an adequate remedy at law. There is no merit to this contention. First, Business and Professions Code section 17203 specifically permits a court to both enjoin unfair competition and to restore any lost moneys or properties resulting from the unfair competition as well. The court's authority to make orders and judgments is very broad. Section 17203 states as follows: "Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may

be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

▮ Furthermore, case law interpreting Business and Professions Code section 17200 holds that courts have broad powers to prohibit unfair practices, including imposition of injunctions and restitution in monetary damages. (See *People* v. *Toomey, supra,* 157 Cal.App.3d 1, 20-21, 24-26.) There is substantial evidence to support the trial court's finding that Bronco violated Business and Professions Code section 17200 by committing unfair business practices with regard to Allied growers as well as with non-Allied growers. This ground for appeal is rejected.

## VIII.

### Allied's Cross-appeal for Agricultural Code Late Charges.

▮ In its cross-appeal Allied argues strenuously and extensively that it is entitled to damages pursuant to Food and Agricultural Code section 55881 which permits a late charge for unpaid balances for the purchase of farm products. Section 55881 states as follows: "Under a contract for the purchase or handling of any farm product, any delinquent payment of money under this chapter shall also include a late charge of 5 percent per month of the unpaid balance calculated on a daily basis for the period of the delinquency for the first month and an additional 1 percent per month of the unpaid balance calculated on a daily basis for the remaining period of the delinquency. Any such late charge shall be payable to the person from whom the farm product was purchased, unless the person waives, in writing, his right to such payment. Such waiver shall be valid and effective only when given after a delinquency has occurred.

"This section does not effect the time of payment provided for in this chapter or in any contract for the purchase or handling of any farm product."

Bronco's response to this contention is simple but deadly. Bronco contends, and Allied does not deny, that Allied is a nonprofit cooperative association formed pursuant to Food and Agricultural Code sections 54001 et seq. Section 55881 is part of chapter 6, division 20 of the Food and Agricultural Code. Section 55461 is also part of chapter 6, division 20 of the Food and Agricultural Code. Section 55461 states as follows: "This chapter does not apply to or include any nonprofit cooperative association which is organized and operating pursuant to Chapter 1 (commencing with Section 54001) of this division or of similar laws of any other states or District of Columbia or the United States or the agents of such organizations in the

performance of their duties as such except as to that portion of the activities of such organization, or agent, which involves the handling or dealing in any farm product of nonmembers of such organizations."

By the express terms of Food and Agricultural Code section 55461, chapter 6 does not apply to or include "any nonprofit cooperative association which is organized and operating pursuant to Chapter 1 (commencing with Section 54001) of this division . . . ." Cooperative associations are expressly excluded from chapter 6. The damage provisions of section 55881 do not apply to nonprofit cooperative associations.

Allied contends that because the cooperative acted as an agent for its member growers that Food and Agricultural Code section 54173, which expressly provides for such agency, would permit Allied to obtain late charge damages as agent rather than as cooperative. However, the trial court correctly reasoned that cooperatives were not entitled to the benefits of section 55881 due to the express provisions of section 55461.

The Legislature has preempted this issue through specific legislation. Although Allied's arguments are both passionate and persuasive to the effect that we must interpret the law more equitably, it appears that its only recourse is through repeal of section 55461. The Legislature has expressed a clear legislative intent that cooperatives shall not be entitled to the benefits of chapter 6, and we can find no valid reason to hold to the contrary. This issue raises a question of legislative policy which should be resolved in that body, not in the courts. (*DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 177 [18 Cal.Rptr. 369, 367 P.2d 865]; 9 Witkin, Cal. Procedure [3d. ed. 1985] Appeal, § 266, pp. 273-274.) The trial court did not err in denying Allied late charges for delinquent payments.

## DECISION

The judgment against Bronco Wine Company is affirmed. Allied's cross-appeal is rejected and the judgment on the cross-appeal is also affirmed. Allied is awarded its costs on appeal.

Franson, P. J., and Woolpert, J., concurred.

A petition for a rehearing was denied August 26, 1988, and the opinion was modified to read as printed above. The petition of defendant and appellant for review by the Supreme Court was denied October 26, 1988.