TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

BILL LOCKYER
Attorney General

|  |  |  |
|---|---|---|
| OPINION | : | No. 99-307 |
| of | : | December 22, 1999 |
| BILL LOCKYER | : | |
| Attorney General | : | |
| CLAYTON P. ROCHE | : | |
| Deputy Attorney General | : | |

WILLIAM KENEFICK, ACTING COMMISSIONER OF CORPORATIONS, has requested an opinion on the following question:

May a licensed residential mortgage lender charge the borrower interest from the date its funds are paid into escrow rather than from the date the funds are disbursed from escrow for the borrower's use?

CONCLUSION

A licensed residential mortgage lender may not charge the borrower interest from the date its funds are paid into escrow rather than from the date the funds are disbursed from escrow for the borrower's use.

ANALYSIS

In 1994, the Legislature enacted a comprehensive statutory scheme, the California Residential Mortgage Lending Act (Fin. Code, §§ 50000-50707; "Act"), operative January 1, 1996, to regulate the business of making residential mortgage loans. Persons conducting such business must obtain a license from the Commissioner of Corporations. (Fin. Code, § 50002.) The Act authorizes licensees to engage in specified transactions (Fin. Code, § 50129), and expressly prohibits them from engaging in other activities (Fin. Code, § 50204, subd. (i)). One prohibition is that a licensee may not "[e]ngage in any acts in violation of Section 17200 or 17500 of the Business and Professions Code." (Fin. Code, § 50204, subd. (i).) Business and Professions Code section 17200 provides:

"As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

Business and Professions Code section 17500 states in turn:

"It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any manner or means whatever, any statement, concerning such real or personal property or services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any such person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell such personal property or services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both."

These two statutes are the primary provisions of the Unfair Competition Act (Bus. & Prof. Code, § 17200 et seq.; "UCA").

We are asked whether, in the context of a sale of residential property, it would be an unfair business practice for a licensed residential mortgage lender to charge the borrower interest from the date its funds are paid into escrow rather than from the close of escrow when the funds become available for the borrower's use. We conclude that it would be an unfair business practice to charge the borrower interest before the close of escrow.

In *State Farm Fire & Casualty Co.* v. *Superior Court* (1996) 45 Cal.App.4th 1093, 1102-1104, the court explained the purposes of the UCA:

"The statutory scheme of the UCA is straightforward. In section 17200 of the Business and Professions Code (section 17200) any *'unlawful,' 'unfair' or 'fraudulent'* business act or practice is deemed to be unfair competition. . . .

". . . . Because section 17200's definition is disjunctive, a 'business act or practice' is prohibited if it is 'unfair' *or* 'unlawful' *or* 'fraudulent.' In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa. (*Motors, Inc.* v. *Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740, fn. 2.) . . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . [I]t is not necessary for a business practice to be 'unlawful' in order to be subject to a UCA action. The 'unfair' standard, the second prong of section 17200, also provides an independent basis for relief. This standard is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. (*Motors, Inc.* v. *Times Mirror Co.*, *supra*, 102 Cal.App.3d at 740.) The test of whether a business practice is unfair 'involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . . [Citations.]' (*Ibid.*) In *People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, the court, acknowledging that the parameters of the term 'unfair business practice' had not been defined in a California case, applied guidelines adopted by the Federal Trade Commission and sanctioned by the United States Supreme Court in *FTC* v. *Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 244 [31 L.Ed.2d 170, 179, 92 S.Ct. 898]. The court concluded that an 'unfair' business practice occurs when that practice 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' (*People* v. *Casa Blanca Convalescent Homes, Inc.*, *supra*, 159 Cal.App.3d at p. 530.)

"Examples of unfair business practices include: charging a higher than normal rate for copies of deposition transcripts (by a group of certified shorthand reporters), where the party receiving the original is being given an undisclosed

discount as the result of an exclusive volume-discount contract with two insurance companies (*Saunders* v. *Superior Court* (1994) 27 Cal.App.4th 832, 840-841; placing unlawful or unenforceable terms in form contracts (*People* v. *McKale* (1979) 25 Cal.3d 626, 634-635; asserting a contractual right one does not have (*People* v. *McKale*, *supra*, 25 Cal.3d at pl 635; *People* v. *Custom Craft Carpets, Inc.* (1984) 159 Cal.App.3d 676, 683-684; systematically breaching a form contract affecting many consumers (*Orkin Exterminating Co., Inc.* v. *F.T.C.* (11th Cir. 1988) 849 F.2d 1354, 1367-1368), or many producers (*Allied Grape Growers* v. *Bronco Wine Co.* (1988) 203 Cal.App.3d 432, 449-453; and imposing contract terms that make the debtor pay the collection costs (*Bondanza* v. *Peninsula Hospital & Medical Center* (1979) 23 Cal.3d 260, 266-267)."  (Fn. omitted.)

The same fundamental analysis was provided more recently in *Podolsky* v. *First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647.

In applying the tests set forth in *State Farm* and *Podolsky*, we are directed to balance the impact of the practice in question on the alleged victim against the justification for such practice. Is subjecting the borrower to the payment of interest prior to the time the funds are made available for the borrower's use "substantially injurious to consumers"?  We believe that it is.

If we were to conclude otherwise, a lender could pay the funds into escrow two weeks, two months, or any length of time prior to the close of escrow, and the borrower would be obligated to pay the interest without having the use of the funds.  Significantly, it is the lender who controls when the funds are paid into escrow, not the borrower.  Lenders can protect themselves from loss by depositing the funds when the funds are needed.

Indeed, we are informed that in the overwhelming majority of cases, a lender's funds are not paid into escrow until the day before escrow closes.  All contingencies have been removed; all documents have been signed.  The California Credit Union League, for example, has informed us by memorandum (April 9, 1999):

"It is the business [practice] of most credit unions that offer real estate loans to charge interest to the borrow[er] from the date the funds are disbursed from the escrow rather than the date that the funds are paid into escrow.  In order to minimize any loss of interest income, the lender will communicate with the escrow company often to ascertain the actual date of signing.  Usually a lender will fund the escrow account no more that 24 hours prior to when the consumer signs the loan documents."

With these "practical" considerations in mind,[1] we observe that the UCA is to be interpreted broadly to protect the public from substantially injurious practices. (See *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209-210; *People* v. *McKale* (1979) 25 Cal.3d 626, 631-632; *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113; *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 383; *Hewlett* v. *Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 519; *Samura* v. *Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1291-1292; *Consumers Union of United States, Inc.* v. *Fisher Development, Inc.* (1989) 208 Cal.App.3d 1433, 1438-1439.) Moreover, the Commissioner of Corporations, who is responsible for administering the Act, has interpreted the UCA as not allowing the borrower to be charged interest prior to the time the funds are made available to the borrower. "Unless unreasonable or clearly contrary to the statutory language or purpose, the consistent construction of a statute by an agency charged with responsibility for its implementation is entitled to great deference. [Citation.]" (*Dix* v. *Superior Court* (1991) 53 Cal.3d 442, 460.) Finally, in a related context it is recognized as sound public policy to prohibit the earning of interest until the funds are made available to the borrower. (Cal. Code Regs, tit. 10, § 1457, subd. (a) [". . . a finance company may collect and receive charges only on the portion of the unpaid principal balance actually disbursed to the borrower or on the borrower's behalf, and only from the date of disbursement"].)

Accordingly, we would have little difficulty in concluding that a mortgage lender may not charge the borrower interest from the date its funds are paid into escrow rather than from the date the funds are disbursed--if our analysis were limited to the requirements of the Act and the UCA. However, the provisions of a third statutory scheme must also be considered.

In Civil Code section 2920-2967,[2] the Legislature has enacted various requirements relating to residential property mortgages. Of particular significance here is section 2948.5, which provides:

"Interest on the principal obligation of a promissory note secured by a mortgage or deed of trust on real property improved with one-to-four residential dwelling units shall not commence to accrue prior to close of escrow if the loan proceeds are paid into escrow or, if there is no escrow, the date upon which the loan proceeds have been made available for withdrawal as a matter of right, as specified in subdivision (d) of Section 12413.1 of the Insurance Code.

"This section does not apply if the loan proceeds are paid or made available, as the case may be, in cash or by a check, cashier's check, negotiable order of withdrawal, share draft, traveler's check, or money order issued by, or drawn on, a financial institution, the accounts of which are insured by an agency or

---

[1] Insurance Code section 12413.1 recognizes the "same day availability" of electronically transferred funds, the use of which is now the prevalent practice in residential property escrows.

[2] All references hereafter to the Civil Code are by section number only.

instrumentality of the United States, and which has an office in this state from which payment may be obtained."

What effect, if any, does section 2948.5 have upon the question presented?

As for the first paragraph of section 2948.5, the language appears straightforward and supports our interpretation of the Act and the UCA. Charging borrowers interest on residential mortgages must commence upon the close of escrow rather than from the time the funds are deposited into escrow.

The second paragraph of section 2948.5 is not so easily construed. First, it does not expressly authorize anything. Instead, it seemingly provides only an exemption from the first paragraph of the statute in the specified circumstances. It does not purport to provide an exemption from any other statutory requirements, such as contained in the Act or the UCA. Moreover, it does not use the term "escrow." We believe that the language of the second paragraph of section 2948.5 is ambiguous.

In interpreting language of section 2948.5, subdivision (b), we may apply well established principles of statutory construction. "To interpret statutory language, we must 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.]" (*California Teachers Assn.* v. *Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632.) Committee reports are often useful in determining the Legislature's intent. (*People* v. *Cruz* (1996) 13 Cal.4th 764, 773-774, fn. 4.) " 'Statements in legislative committee reports concerning the statutory purposes which are in accordance with a reasonable interpretation of the statute will be followed by the courts.' " (*O'Brien* v. *Dudenhoefer* (1993) 16 Cal.App.4th 327, 334.) "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citation.]" (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.)

The statutory language in question was adopted in 1985. (Stats. 1985, ch. 1393, § 1.) The legislative history indicates that the purpose of the proposed legislation was to prevent lenders from using out-of-state banks in order to collect interest on funds from two different borrowers at the same time. If a lender could charge interest before the funds became available at the close of escrow, it could earn interest during this "float" period from some other borrower. As explained in the report of the Senate Rules Committee dated May 30, 1985:

"The purpose of this bill is to prohibit the collection of interest from borrowers until they have use of or access to the loan proceeds.

"Reason for bill

"According to the California Association of Realtors, sponsor of this bill,

lenders are increasingly funding buyers' loans with checks drawn on out-of-state institutions. The time gap between the disbursal of moneys and actual collection of the instruments funding the escrow, permits the creation of a 'float' whereby purchasers of real property are charged interest on drafts made out to title companies by banks before the closing of escrow. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . The California Association of Realtors states that it is entirely fair that the lender get his or her interest from the borrower for the period of time for which the borrower has the use of the money, and not get bonus interest because of a situation which the lender may have contrived to get both the interest from the borrower and the float on the check issued to the borrower for the loan."

The report of the Assembly Committee on Finance and Insurance for its hearing of July 17, 1985, stated in part:

"It would seem axiomatic that one doesn't pay for the use of something until you have its use. Either the funds are available or they are not. If the payor is attempting to issue the check at a distance in order to take advantage of the float but treat the date of the check as date of disbursement, the borrower would be subsidizing the lender. . . ."

The primary purpose of the legislation thus had nothing to do with allowing lenders using in-state banks to charge borrowers interest prior to the close of escrow. The only statement in the legislative history that explains the in-state bank exception is contained in a letter from the author of the bill, Senator Barry Keene, to the Governor dated September 24, 1985:

". . . This provision is not intended to discriminate against any out-of-state institution. Existing law requires funds drawn on in-state institutions to be immediately available to the consumer; and, therefore there should not be a necessity to make inquiry about when the loan proceeds are available."

This understanding of the legislation's purpose by its author undermines any suggestion that lenders using in-state financial institutions were to receive a special favor by being allowed to charge interest before the close of escrow. Rather, it was assumed that funds drawn on in-state banks would become immediately available to the borrower at the time of their deposit into escrow–in effect, the deposit of the funds would immediately precede the close of escrow when the funds would be disbursed.

Such interpretation of section 2948.5 is consistent with our interpretation of the Act and the UCA. "Existing law" under the Act and UCA requires the lender's funds to be available to the borrower in order for the borrower to be charged interest. The second paragraph of section

2948.5 does not affect any other statute that prohibits borrowers from being charged interest prior to the time the funds are disbursed.

If any doubt were to remain as to the legality of charging borrowers interest before the funds became available, we need only harmonize the provisions of section 2948.5 with another statutory provision. Insurance Code section 12413.5 states:

"All funds received in connection with any escrow conducted by a title insurance company, controlled escrow company, or underwritten title company shall be deposited in a separate depository account in a bank or savings and loan association or in an account in an industrial loan company insured by the Federal Deposit Insurance Corporation, and the funds so deposited shall be the property of the person or persons entitled thereto under the provisions of the escrow and segregated escrow by escrow in the records of the title insurance company, controlled escrow company, or underwritten title company. The funds shall not be subject to any debts of the title insurance company, controlled escrow company, or underwritten title company and shall be used only to fulfill the terms of the individual escrow for which the funds were accepted and none of the funds shall be utilized until the conditions of the escrow have been met.

"*Any interest received on funds deposited in connection with any escrow which are deposited in a bank, savings and loan association, or industrial loan company shall be paid over by the escrow to the depositing party to the escrow unless the escrow is otherwise instructed by the depositing party,* and shall not be transferred to the account of the title insurance company, controlled escrow company, or underwritten title company." (Italics added.)

Hence, under Insurance Code section 12413.5, the escrow holder must pay to the lender any interest earned on its funds prior to the close of escrow unless the lender instructs otherwise. This statutory requirement protects the lender from loss when it deposits the funds early during the escrow period.

We are to "interpret a statute in context, examining other legislation on the same subject to determine the Legislature's probable intent. [Citation.]" (*Calif. Teachers Assn*. v. *Governing Bd. of Rialto Unified School Dist.*, *supra*, 14 Cal.4th at 642.) Our construction of section 2948.5 allows the lender to earn interest on its funds from the financial institution that has use of the funds prior to the close of escrow; however, a lender should not be able to earn "bonus interest" from two different sources on the same funds at the same time. The contrary construction of section 2948.5 would allow the very evil the statute was intended to prevent.

We conclude that a licensed residential mortgage lender may not charge the borrower interest from the date its funds are paid into escrow rather than from the date the funds are disbursed from escrow for the borrower's use.

\* \* \* \* \*